FRANK O. ALFORD, WILKIE P. BEATTY, as Executrix of the Estate of
PAUL B. BEATTY, CARSON INSURANCE AGENCY, INC., PATRICIA A.
EDLUND, STANLEY EDLUND, JAMES M. GILFILLIN, LARRY G. GOLD-
BERG, RAQUEL T. GOLDBERG, BETTY F. RHYNE, ROBERT R. RHYNE
AND NORMAN V. SWENSON, DERIVATIVELY IN THE RIGHT OF ALL
AMERICAN ASSURANCE COMPANY, Plaintiffs v. ROBERT T. SHAW,
AMERICAN COMMONWEALTH FINANCIAL CORPORATION, GREAT
COMMONWEALTH LIFE INSURANCE COMPANY, ICH CORPORATION,
CHARLES E. BLACK, S. J. CAMPISI, ROY J. BROUSSARD, TRUMAN D.
COX, FRED M. HURST, C. FRED RICE AND PEGGY P. WILEY, DEFEND-
ANTS AND ALL AMERICAN ASSURANCE COMPANY, BENEFICIAL PARTY

No. 8426SC371

(Filed 5 February 1985)

Corporations §§ 4, 6— shareholders' action—litigation committee appointed by
board of directors—power to bind corporation—procedure improper—applica-
tion of business judgment rule improper

Directors of North Carolina corporations who are parties to a derivative
shareholders' action may not confer upon a special committee of the board of
directors the power to bind the corporation as to its conduct of the litigation;
therefore, the trial court erred in granting summary judgment by applying the
"business judgment rule" to a decision by a litigation evaluation committee ap-
pointed by defendant's board of directors to seek summary judgment as to the
great bulk of plaintiff's derivative claims and to settle the rest.

APPEAL by plaintiffs from *Snepp, Judge.* Judgment entered
12 December 1983 in MECKLENBURG County Superior Court.
Heard in the Court of Appeals 3 December 1984.

Plaintiffs brought this derivative action, alleging a variety of
fraudulent, unlawful and self-interested actions by defendants.
Plaintiffs alleged that defendants Shaw and Rice and the named
corporate defendants ("the Shaw group") had manipulated the
assets and actions of All American Assurance Company ("All
American") to "loot" All American's assets and transfer the bulk
of its capital to the Shaw group. [All American had previously
undergone rehabilitation, resulting in an earlier action involving
many of the same parties and counsel. *See Swenson v. Thibaut,*
39 N.C. App. 77, 250 S.E. 2d 279 (1978), *disc. rev. denied and ap-
peal dismissed,* 296 N.C. 740, 254 S.E. 2d 181-83 (1979).]

Pursuant to plaintiffs' original demand for recovery of losses
resulting from the allegedly wrongful transactions, the Board of
Directors ("the Board") of All American retained counsel to select

a Special Investigative Committee ("the Committee"). Counsel recommended Marion G. Follin, a retired insurance executive, and attorney Frank M. Parker, formerly a judge of this court. The Board elected Follin and Parker to membership and designated them as the Committee, according them full investigative powers and giving them binding authority regarding institution of any legal action. The Committee conducted an investigation, and submitted a report which concluded that action be taken only with regard to two of plaintiffs' specific allegations, representing only a small portion of the total claim. The Committee negotiated a settlement of these claims with the two corporations involved.

Based on the Committee's report, All American moved for approval of the settlement and summary judgment as to the remaining issues. The individual directors, with the exception of Shaw and Rice, also moved for summary judgment. The trial court ruled that the "business judgment rule" controlled the case, and that the only issues were whether the Committee consisted of disinterested, independent directors acting in good faith, and whether the investigation was appropriate as to scope and procedure. From an order granting both motions, plaintiffs appealed.

*Cansler & Lockhart, P.A., by Thomas Ashe Lockhart and Bruce M. Simpson, for plaintiff.*

*Adams, Kleemeier, Hagan, Hannah & Fouts, by Daniel W. Fouts and Bruce H. Connors, for defendants Black, Broussard, Campisi, Cox, Hurst and Wiley.*

*Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by R. M. Stockton, Jr. and Daniel R. Taylor, Jr., for All American Assurance Company.*

WELLS, Judge.

None of the parties raises the issue, but we must first address the appealability of the judgment. *In re Watson,* 70 N.C. App. 120, 318 S.E. 2d 544 (1984). The summary judgment disposed of fewer than all parties, leaving the Shaw group nominally in the action, and the court did not certify that there was no just reason for delay. *See* N.C. Gen. Stat. § 1A-1, Rule 54(b) of the Rules of Civil Procedure (1983). Since the unresolved claim against the Shaw group is also a derivative claim, whether or not the order

was technically interlocutory it did in fact effectively terminate plaintiffs' action. It thus affected a substantial right and is immediately appealable. N.C. Gen. Stat. § 1-277 (1983); N.C. Gen. Stat. § 7A-27(d) (1976).

The only real question presented by this appeal is whether the court could properly grant summary judgment by applying the "business judgment rule" to the Committee's decision to seek summary judgment as to the great bulk of plaintiffs' derivative claims and settle the rest. Both sides properly treat this as a question of first impression in this state. The issue arose in *Swenson* but we did not need to reach it since the record there clearly showed that the decision not to pursue the derivative claim was made by the interested directors themselves, and not their "litigation evaluation committee."

The derivative action has only recently achieved legislative recognition in North Carolina. 1973 N.C. Sess. Laws c. 469, s. 12, *codified at* N.C. Gen. Stat. § 55-55 (1982). The North Carolina statute contains liberal provisions favoring, by contrast with laws of other jurisdictions, suits by minority shareholders. *See* R. Robinson, N.C. Corporation Law and Practice § 14-1 (3d ed. 1983) [hereinafter "Robinson"]. The derivative action allows minority shareholders, for the benefit of the corporation, to sue directors for corporate mismanagement. *See Id.* at § 14-2. Although with closely held corporations individual relief may be more appropriate (and derivative action futile), *see Miller v. Ruth's of North Carolina, Inc.*, 68 N.C. App. 40, 313 S.E. 2d 849, *disc. rev. denied*, 311 N.C. 760, 321 S.E. 2d 140 (1984), with larger publicly held corporations, such as All American, a derivative action may provide the only truly effective legal means for minority shareholders to prevent or remedy destructive acts of wrongdoing directors. *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949) (policy and history reviewed). Of course, minority shareholders may always sell out, but when the value of their shares has been substantially undermined by corrupt dealings, legal action to remedy the destruction in value may be preferable. As a matter of policy, then, our courts should look favorably on derivative actions and discourage procedural devices designed to frustrate them.

Procedurally, the shareholder plaintiffs must first seek to obtain their remedy within the corporation itself, unless such de-

mand would be futile. G.S. § 55-55(b); *Swenson v. Thibaut, supra.* The demand requirement serves the obvious purpose of allowing the corporation the opportunity to remedy the alleged problem without resort to judicial action, or, if the problem cannot be remedied without judicial action, to allow the corporation, as the true beneficial party, the opportunity to bring suit first against the alleged wrongdoers. *See generally Hill v. Erwin Mills, Inc.,* 239 N.C. 437, 80 S.E. 2d 358 (1954). The Committee was established in the present case to respond to plaintiffs' demand, made in accordance with the statute, for action against the allegedly self-dealing directors.

Defendants sought, and obtained, application of the "business judgment rule" to the Committee's decision. The rule simply means that courts, honoring principles of corporate self-government, will not inquire into good faith decisions involving business judgment; directors not being liable for mere mistakes of judgment. *Robinson, supra,* § 12-6. It is well established that where a corporation, pursuant to a good faith business decision by the board of directors, elects *not* to pursue a claim upon demand, the business judgment rule prevents a shareholder from substituting his or her judgment by initiating a derivative action. *See United Copper Secur. Co. v. Amalgamated Copper Co.,* 244 U.S. 261 (1917) (authoritative opinion of Justice Brandeis) (cited in *Swenson*). When the alleged wrongdoing involves fraud or other breach of fiduciary duty by serving directors, however, and those same directors decide not to bring suit on behalf of the corporation, the business judgment rule, premised on good faith, clearly has no application at the summary disposition stage. Such was the situation in *Swenson,* and we accordingly affirmed an order denying the corporate defendants' motion to dismiss. *See also Robinson, supra,* § 14-13; *Nussbacher v. Continental Ill. Nat. B. & T. Co., Chicago,* 518 F. 2d 873 (7th Cir. 1975), *cert. denied,* 424 U.S. 928 (1976). Traditionally, this has meant that the business judgment rule has been a defense on the merits in such cases, *see Swenson v. Thibaut, supra,* making a case difficult to dispose of summarily and thus raising the threat of "strike suits," *i.e.,* marginally meritorious claims brought not for the nominal corporate relief sought but to harass or to compel lucrative settlements. *See Robinson, supra,* § 14-1; *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, *reh'g denied,* 384 U.S. 915 (1966).

In recent years, however, corporations have begun to use the rule as a "sword" to cut off derivative actions premised on breaches of fiduciary duty. *Robinson, supra,* § 14-13. They have done so through the device of "special litigation committees," groups of serving directors with no direct interest in the alleged wrongful transactions, or disinterested outsiders elected to serve on the board. Typically, the committee is invested with power to decide for the board whether or not to pursue the claim. If such a committee cannot independently bind the board, its role would remain purely advisory, subject to the control of the alleged wrongdoers, and thus the committee's decision would essentially be meaningless. That was the situation in *Swenson*; since the committee's recommendation there was not independent, we did not reach the question of whether it conclusively precluded a derivative action. Where the committee members are genuinely disinterested and have binding authority, however, their good faith decision not to pursue a claim may present the application of the business judgment rule. Following the landmark decision in *Auerbach v. Bennett*, 47 N.Y. 2d 619, 393 N.E. 2d 994 (1979), many courts have allowed the decisions of independent committees to control derivative litigation, subject only to varying levels of inquiry into the good faith and procedural adequacy of the committees' decisions. The application of *Auerbach* was argued in *Swenson*, and *dicta* in our opinion suggests that this court would follow it. However, such *dicta* does not control our decision here. *State ex rel. Utilities Comm. v. Central Telephone Co.*, 60 N.C. App. 393, 299 S.E. 2d 264 (1983).

Plaintiffs do not contest the disinterested status of the Committee selected in this case. The Committee's decision provided the sole basis for the judgment below. It is clear that the Board possessed statutory authority to establish such a committee and to authorize it to take binding action. N.C. Gen. Stat. § 55-31 (1982). The questions of the effect of the Committee's decision not to pursue plaintiffs' claims, and the application of the business judgment rule thereto as grounds for summary judgment, therefore are squarely presented for the first time in this state.

Before discussing the various apposite cases of other jurisdictions, we note again the public policy favoring derivative actions. We also note the fiduciary relation of the directors to the corporation and its stockholders, which requires the "most scrupulous

observance" of their duty to protect the corporation and to refrain from acts injuring it or depriving it of its proper opportunities. *Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E. 2d 551 (1983) (citing *Guth v. Loft,* 23 Del. Ch. 255, 5 A. 2d 503 (1939) ). In the present procedural context of this case, the Committee's report justifies summary judgment only if it conclusively establishes a complete defense. All evidentiary conflicts are resolved in favor of plaintiffs, whose papers are treated indulgently, while defendants' papers are scrutinized with care. *Vassey v. Burch,* 301 N.C. 68, 269 S.E. 2d 137 (1980).

We start our analysis of the applicable law with *Auerbach:* despite the novelty of the special litigation concept, the principles adopted therein have generally been accepted. The Court of Appeals of New York began with "the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments." *Auerbach v. Bennett, supra.* Absent evidence of bad faith or fraud, the courts should respect such decisions, including the decision to pursue (or not) a derivative claim, given the "variety of disparate considerations" which enter such a decision. *Id.* The court accordingly limited its investigation of the committee itself to whether the directors were in fact disinterested and independent. Citing its typically extensive experience with fact finding procedures, the court also undertook to review the adequacy of the committee's investigative procedures. *Id.* The question thus presented was only whether the procedures were so restricted in scope or execution as to raise questions of bad faith or fraud; absent such evidence, the substantive evaluation of the committee lay "beyond the reach" of the court. *Id.* The court expressly rejected the contention that the board, with alleged wrongdoers sitting on it, could not legally delegate to a committee the authority to terminate derivative action against it. *Id.* The two-part *Auerbach* test, restricted to disinterestedness of the committee and adequacy of its procedures, has been adopted by a number of other courts. *See Lewis v. Anderson,* 615 F. 2d 778 (9th Cir. 1979), *cert. denied,* 444 U.S. 869 (1980) (California law) ("clear trend in corporate law"); *Genzer v. Cunningham,* 498 F. Supp. 682 (E.D. Mich. 1980) (Michigan law); *Roberts v. Alabama Power Co.,* 404 So. 2d 629 (Ala. 1981) (Alabama law).[1]

1. Note that the federal decisions, relying on *Burks v. Lasker,* 441 U.S. 471 (1979), have followed state rather than federal law in determining whether the

The essentially procedural approach adopted in *Auerbach* has created judicial concern that litigation committees will destroy the effectiveness of the derivative action as a means of policing corporate boards of directors. The leading case suggesting a second level of inquiry is *Zapata Corp. v. Maldonado*, 430 A. 2d 779 (Del. 1981). While recognizing the threat posed by *Auerbach* to the vitality of the derivative action, the Supreme Court of Delaware also recognized the value of an internal device by which corporations could rid themselves of meritless litigation. *Id.* The court, searching for a "balancing point" between stockholder and director power, generally adopted the *Auerbach* test, but added that the court should then have discretion to determine, applying its *own* business judgment, whether the suit should nonetheless be maintained even when the *Auerbach* procedural test had been satisfied. *Id.* "The second step is intended to thwart instances where corporate actions meet the criteria of step one [the *Auerbach* test], but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." *Id.* The more probing *Zapata* approach has been followed by several courts. *See Abella v. Universal Leaf Tobacco Co., Inc.*, 546 F. Supp. 795 (E.D. Va. 1982) (Virginia law); *Joy v. North*, 692 F. 2d 880 (2d Cir. 1982), *cert. denied sub nom, City Trust v. Joy*, 460 U.S. 1051 (1983) (Connecticut law) (modifying *Zapata*).[2]

This trend in corporate law has not been without controversy, even in those courts which have adopted one of the two tests. In one case, dissent arose over the fairness and reasonableness of

---

business judgment rule can be used to dismiss derivative claims, absent some overriding federal policy to the contrary. The only court to reverse on ostensible policy grounds was faced with a situation where all the defendant directors in effect shared in the proceeds of the hidden transactions and therefore had a financial interest. *Galef v. Alexander*, 615 F. 2d 51 (2d Cir. 1980) (Ohio claims linked with federal claims).

2. We note that *Zapata* was a case in which no demand had been made for action, and the court restricted its application to "no demand" cases. We see no reason however why it should not apply to cases such as this one, where demand was made although it could legitimately have been excused on the grounds of the directors' self-interest. *See Loy v. Lorm Corp.*, 52 N.C. App. 428, 278 S.E. 2d 897 (1981). To rule otherwise would exalt the form of the demand over its main purpose to avoid resort to the courts, if possible.

the settlement recommended by the committee, even though state law specifically authorized such committees. *In re General Tire & Rubber Co. Sec. Litigation*, 726 F. 2d 1075 (6th Cir. 1984) (Wellford, J., dissenting in part) (Ohio law). And in another case, a court exercised its discretion to *disregard* a committee's decision in ruling on a motion to dismiss on the pleadings. *Reilly Mortg. Group v. Mt. Vernon Sav. & Loan Ass'n*, 568 F. Supp. 1067 (E.D. Va. 1983). *See also Lasker v. Burks*, 567 F. 2d 1208 (2d Cir. 1978) (decision should be ignored if contrary to public policy), *rev'd* 441 U.S. 471 (1979). In *Joy v. North, supra*, the second circuit noted that "[i]t is not cynical to expect that such committees will tend to view derivative actions against the other directors with skepticism. Indeed, if the involved directors expected any result other than a recommendation of termination at least as to them, they would probably never establish the committee." The court refused to accept the committee report as conclusive, applying a somewhat tougher version of *Zapata*. The Sixth Circuit, predicting Massachusetts law, considered applying a conclusive presumption *against* the good faith of such committees, before strictly construing and applying the disinterestedness test of *Auerbach. Hasan v. CleveTrust Realty Investors*, 729 F. 2d 372 (6th Cir. 1984). *See also Abbey v. Computer & Communications Technology Corp.*, 457 A. 2d 368 (Del. Ch. 1983) (procedural complications caused by *Zapata*). And even in *Zapata*, the court cautioned trial courts to give special consideration "to matters of law and public policy in addition to the corporation's best interests." *Zapata Corp. v. Maldonado, supra. See also Auerbach v. Bennett, supra,* (Cooke, C.J., dissenting) (business judgment rule should be only conditionally applicable pending disclosure of facts on which committee relied).

The cases rejecting the special committee device are few. The leading case is *Miller v. Register And Tribune Syndicate, Inc.*, 336 N.W. 2d 709 (Iowa 1983). The Supreme Court of Iowa examined the rationale of *Zapata, i.e.*, that although the taint of self-interest precludes application of the business judgment rule to defendant directors, those same directors may delegate their power to an independent committee which may obtain the protection of the rule. Left unanalyzed and unanswered, continued the court, was the question of why the disqualification to act directly did not also disqualify defendant directors from participating in

the selection of a committee. *Id.* The court analyzed the problem in terms of " 'structural bias' . . . which suggests that it is unrealistic to assume that the members of independent committees are free from personal, financial or moral influences which flow from the directors who appoint them." *Id.* Without analyzing the matter at much greater length[3] and while conceding the directors' statutory authority to appoint litigation committees, the court concluded:

> We believe that the *potential* for structural bias on the part of a lititgation committee appointed by directors who are parties to derivative actions is sufficiently great and sufficiently difficult of precise proof in an individual case to require the adoption of a prophylactic rule. We conclude that we should prevent the potential for structural bias in *some* cases by effectively limiting the powers of such directors in *all* cases.

*Id.* (emphasis added). The court accordingly established a blanket rule against delegation of binding authority as to litigation by directors who were parties to that litigation. *Id.* The court noted that this prophylactic rule did not mean the end of special litigation committees; corporations could apply for the appointment of such committees by Iowa courts of equity. *Id.* The court left untouched the delegation power of non-defendant directors.

In *Maldonado v. Flynn*, 413 A. 2d 1251 (Del. Ch. 1980), *rev'd sub nom, Zapata Corp. v. Maldonado, supra,* the court carefully distinguished between the stockholder and corporate interests in a derivative suit, holding that a corporation which refused to bring suit could not control the individual action to which the corporate right had attached. This rationale was decisively rejected by the Supreme Court of Delaware in *Zapata*; interestingly, and perhaps reflective of other courts' distaste for the *Auerbach* rule, other courts quickly followed *Maldonado v. Flynn, supra. See Maher v. Zapata Corp.,* 490 F. Supp. 348 (S.D. Tex. 1980) (Delaware law) (disregarding two federal decisions); *Abella v. Universal Leaf Tobacco Co., Inc.,* 495 F. Supp. 713 (E.D. Va. 1980) (Virginia law) (denying motion to dismiss) (business judgment rule

---

3. The paucity of detailed judicial analysis *pro or con* is undoubtedly responsible. *See* G. Dent, The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?, 75 N.W. U. L. Rev. 96 (1980) [hereinafter Dent].

"irrelevant"), *summary judgment granted*, 546 F. Supp. 795 (E.D. Va. 1982) (applying *Zapata*).

Our review of the case law indicates that the majority of jurisdictions which have considered the matter have adopted either *Auerbach* or *Zapata*, although this trend has not been unanimous or devoid of controversy. We also must bear in mind that whether corporate boards can dispose of derivative litigation by committees remains essentially a question of state law. *Burks v. Lasker, supra.* Many of the federal decisions *predict* state court rulings on a truly novel question of law, *e.g., Lewis v. Anderson, supra; Genzer v. Cunningham, supra,* and therefore diminish in persuasiveness.

Commentators have expressed concern over the continued vitality of the derivative suit in light of the development of special committees. *See in particular* Dent, *supra* note 3; J. Cox, Searching for the Corporation's Voice in Derivative Suit Litigation: A Critique of *Zapata* and the ALI Project, 1982 Duke L. J. 959 (hereinafter Cox); R. Brown, Shareholder Derivative Litigation and the Special Litigation Committee, 43 U. Pitt. L. Rev. 601 (1982) (hereinafter Brown). Dent in particular criticizes the structural deficiencies in the committee device and the courts' inattention to the myriad intracorporate pressures on allegedly disinterested directors. The committee device, he argues, has effectively shifted to plaintiffs the burden of proof as to the independence of the committee and the reasonableness of the decision not to sue. Moreover, the committee decision is typically made with the assistance of neutral counsel and out of court; the plaintiff's position is not vigorously represented and no possibility exists to compel truthful testimony or suggest changes in the law. *Id.* Dent accordingly makes numerous proposals, including placing the burden of proof on the corporation on its motion to dismiss or for summary judgment, allowing at least limited discovery of committee members, requiring consultation with plaintiffs on selection of counsel, and requiring the committee to explain with particularity the facts and assumptions underlying each reason for the decision not to sue. *Id. See also* Brown, *supra* (proposing clear, cogent, and convincing evidence standard). Following the path set by the cases to date, Dent suggests, will mean the death of derivative suits. While Cox is not as sanguine about the ill effects of the special committee device, he criticizes even the more

active *Zapata* approach as according too great deference to committee decisions and not adequately addressing "structural bias." Finally, Dent, *supra* note 3 (footnote omitted) summarizes the state of the law thus:

> It is doubtful whether the shareholders' derivative suit deserves the sudden interment it is being given. At the very least, pronouncement of this death sentence by the courts constitutes unjustifiable judicial legislation. More shocking is that the courts have neither offered a rationale for condemning the derivative suit nor even acknowledged that they have condemned it. One hopes that the courts simply do not realize that they are endangering the derivative suit and that once they do realize it they will act quickly to reverse the trend by significantly restricting the board's power to terminate derivative suits.

We now must adopt a rule to guide the North Carolina courts. Having reviewed the case law and the commentators, and with due regard to the realities of the situation, we conclude that the approach adopted by the Supreme Court of Iowa in *Miller v. Register And Tribune Syndicate, Inc., supra* must control. The varying degrees of judicial intervention proposed by the various commentators provide too many complications and possibilities for litigation-extending error. And the sweep of the business judgment rule is too broad, once applied, to allow meaningful review. A simple prophylactic rule will better serve the courts in dealing with this sort of case, and further the legislative policy favoring derivative litigation. Accordingly we hold, as did the Iowa court, that directors of North Carolina corporations who are parties to a derivative action may not confer upon a special committee of the board of directors the power to bind the corporation as to its conduct of the litigation.

Practical considerations reinforce our decision. First, we note that the duty required of corporate directors is a strict one, *Meiselman v. Meiselman, supra,* and when breach of that duty is alleged in a derivative suit the directors bear a heavy burden of proof when seeking to dispose summarily of the action. Since subjective intent is frequently involved, summary disposition is not favored, *see Johnson v. Insurance Co.,* 300 N.C. 247, 266 S.E. 2d 610 (1980), and plaintiffs will have a better opportunity to develop

their case. Should we adopt the majority view, however, the burden would effectively be shifted to plaintiff stockholders to show interest, a most difficult task in view of stockholders' lack of access to corporate records and information and of the many levels of financial, social, occupational, and psychological pressures that a corporation's board may be in a position to exert.

Moreover, our review of the cases yields one telling statistic: not one committee, in all these instances, has decided to proceed with suit. Some have recognized the existence of valid claims and settled them, as in the present case, but these have generally constituted a minor portion of the overall claim, as also happened here. This strongly suggests that the problem of structural bias is indeed real.

The business judgment rule has been traditionally used by our courts as a defense *on the merits* to allegations of fraud, not as a procedural device to dispose of derivative litigation. *See Gaines v. Manufacturing Co.*, 234 N.C. 331, 67 S.E. 2d 355 (1951); *Bank v. Bridgers*, 207 N.C. 91, 176 S.E. 295 (1934); *Swenson v. Thibaut, supra; Milling Co., Inc. v. Sutton*, 9 N.C. App. 181, 175 S.E. 2d 746 (1970). It served in the cited cases as an evidentiary standard *in court* to test the sufficiency of the *facts* offered by plaintiff, not as a defense as a matter of law. By adopting the committee approach, and focusing only on disinterest and procedure, we would remove those facts and circumstances from judicial scrutiny. Thus the courts would effectively be bypassed. This we will not allow, any *dicta* in *Swenson* notwithstanding.

Having reached this decision, we discuss briefly its import. We have not abolished the special committee device altogether; it remains viable, particularly where the derivative suit seeks action by the corporation against third-party outsiders. We express no opinion on the use of special committees where the suit alleges wrongdoing by a minority of the board or by single "control persons." Summary judgment will remain an appropriate device where plaintiffs bring suits of little or no merit, and protective orders are available to protect corporations against discovery "fishing expeditions" into irrelevant areas. N.C. Gen. Stat. § 1A-1, Rules 56, -26 of the Rules of Civil Procedure (1983). Consistent with our application of the business judgment rule, such summary judgment must however be on the merits of the decision, not on

the adequacy of intracorporate procedures used to determine those merits.

Corporations represent the dominant form of business organization in this state. They exist at the sufferance of the state and under a legal framework established by the state. Their directors have a high and strict duty to avoid impropriety. Under these circumstances, the courts cannot abdicate their critical fact-finding role as guardians of the public interest to internal corporate committees.

Applying the rule and policy we have established to the facts before us, the court clearly erred in granting summary judgment. The named defendants were members of the Board that selected the Committee, and as such could not delegate to the Committee the authority to terminate plaintiffs' suit. Plaintiffs' expert affidavit, treated indulgently, tends to show a pattern of corrupt dealings, instigated by the Shaw group and approved by the other defendants, clearly justifying relief far beyond the minor settlements arranged by the Committee. Summary judgment was thus inappropriate. Accordingly, the judgment entered must be vacated and the cause remanded for further proceedings consistent with this opinion.

Vacated and remanded.

Judges HEDRICK and EAGLES concur.