**Martin ROSENGARTEN and M.V.P. Personnel Agency, Inc.**

v.

**John L. BUCKLEY, Jr., John F. Caffey, Donald L. Dick, Jr., John D. Doub, Leonard Gerber, Richard L. Hall, James J. Harrison, Jr., Charles P. McCormick, Jr., Robert B. McFadden, David B. Michels, Clayton E. Shelhoss, Bailey A. Thomas, Harry K. Wells, Hillsman V. Wilson, W. Gordon Yates, Sandoz, Ltd., Sandoz Finance, N.V.S. F.C., Inc. and McCormick & Company, Incorporated.**

Civ. No. HM80–2935.

United States District Court, D. Maryland.

July 26, 1985.

Alvin J. Filbert, Jr. and Wartzman, Rombro, Rudd & Omansky, Baltimore, Md., Irving Bizar and Bizar, D'Alessandro & Shustak, New York City, for plaintiffs.

John Martin Jones, John A. MacColl, Piper & Marbury, Baltimore, Md., for all defendants except Sandoz & McCormick.

Donald A. Scott, Jessica Sanders Jones and Morgan, Lewis & Bockius, Philadelphia, Pa., Richard W. Single, Jr., Sr., Hunt Valley, Md., for McCormick.

George Beall & Miles & Stockbridge, Baltimore, Md., for Sandoz.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

Presently pending in this stockholder derivative suit is defendant McCormick & Company, Incorporated's ("McCormick" or "the Company") motion to dismiss, or in the alternative, for summary judgment. Defendant has filed two memoranda, the report of a special litigation review committ-

tee, and the attachments thereto, and a number of affidavits in support of the motion. Plaintiffs oppose the motion and have filed memoranda and affidavits. The matter came before the court for hearing on Friday, May 17, 1985. At the hearing, the court took testimony and heard legal argument from the parties.

*Factual and Procedural Background*

This action is the aftermath of McCormick's rejection of the interest of Sandoz, Ltd. ("Sandoz"), a large Swiss pharmaceuticals company, in acquiring the Company. That interest was expressed by the accumulation of 4.85% of the Company's outstanding non-voting stock ("Sandoz shares") and a subsequent proposal for a cash merger with the Company at $37 per share. After the McCormick Board rejected the Sandoz offer, the Company instituted an action in this District against Sandoz alleging violations of federal and state securities laws. In settlement of that action, McCormick and Sandoz agreed in the fall of 1980 that McCormick would purchase the Sandoz shares at a price of $28 per share, the prevailing market price on the date the tentative settlement was reached.

The amended complaint in this case alleges that the purchase by McCormick of the Sandoz shares was an "improper, unnecessary waste of corporate assets and a fraud upon the corporation and its shareholders." It asserts that the purchase served "no valid business purpose" other than to avoid the risk that the individual officers and directors would "lose their employment positions" with McCormick and that the Company paid a price for the shares that was "excessive and out of all proportion to the value of the shares." The amended complaint further alleges that the Company and its officers failed to disclose that the real reason for the purchase of the Sandoz shares was to preserve the position of existing management of the Company. The amended complaint seeks to remedy this alleged breach of fiduciary duty to McCormick by obtaining: (1) a cancellation of the contract of sale between Sandoz and McCormick; (2) an accounting from the individual defendants for their profits and for the damages sustained by McCormick;

and (3) an award to the plaintiffs of the costs and expenses of the lawsuit.

Plaintiffs first filed this derivative action on November 12, 1980. On February 23, 1982, 565 F.Supp. 193, this court ordered the complaint dismissed and plaintiff Rosengarten to post security for costs. Plaintiff took an appeal to the Fourth Circuit from the order to post security for costs. While the appeal was pending, the plaintiffs filed a motion to intervene on behalf of M.V.P. Personnel Agency, Inc. in order to avoid the requirement for security for costs. The court granted this motion on March 1, 1983. Plaintiffs filed the second amended complaint on March 11, 1983, the defendants again moved to dismiss, and the court denied this motion on October 31, 1983.

The Litigation Review Committee of McCormick ("the Committee"), whose report and recommendation is the subject of the instant motion, had its genesis in the action of the Board on July 19, 1982. On that day, the Board unanimously adopted a resolution establishing a "Litigation Review Committee" of the Board to consider such matters as might be referred to it. On October 18, 1982, the Board unanimously approved resolutions creating two litigation review committees to "consider and act upon all matters from time to time delegated to them by this Board of Directors in connection with specific litigation, and otherwise monitor and review such litigation, and consult with the Corporation's general or special counsel with respect thereto in such manner as they shall deem appropriate." Subsequently, on January 16, 1984, the Board consolidated the two review committees into one and authorized the consolidated committee to obtain independent counsel and independent experts as necessary and appropriate to their consideration and review of litigation matters. The *Rosengarten* action was referred to this consolidated committee.

The Committee consists of Erskine N. White, Jr., Chairman, James S. Cook and George V. McGowan. Each member is a director of the Company; none of them

was a board member or had any connection with the Company at the time of the transaction attacked in the *Rosengarten* action. The Committee's counsel are Michael J. Kelly, the Dean of the University of Maryland's School of Law, and Richard M. Phillips, a partner in the Washington, D.C. law firm of Kirkpatrick, Lockhart, Hill, Christopher & Phillips. Dean Kelly is an expert on legal ethics. Mr. Phillips is a former staff official of the Securities and Exchange Commission and the present Chairman of the American Bar Association's Committee on Federal Regulation of Securities. He is a nationally recognized expert in securities and corporate law.

The Committee met regularly over a five-month period between January 1984 and June 1984. It examined the facts and circumstances of the Company's opposition to a Sandoz takeover attempt beginning in September 1979 in order to evaluate the good faith and the reasonableness of the McCormick Board in authorizing the purchase of Sandoz shares in August 1980. Specifically, it considered the Board's refusal of Sandoz' cash merger offer, the decision to file suit against Sandoz in federal court, and the repurchase decision. The Committee interviewed a number of witnesses, and examined documents from the files of the Company and Piper and Marbury, the Company's legal adviser at the time. It reached certain findings and conclusions which are set out in its report. It then recommended that the Board move to dismiss the *Rosengarten* case because the case was without merit and its continued prosecution on behalf of McCormick was unjustified and contrary to McCormick's best interests. On the strength of the Committee's report and recommendation, McCormick filed the instant motion.

*The Issue*

The issue before the court is fairly straightforward. It is whether and under what circumstances the board of directors of a company named as a nominal defendant in a stockholder suit brought for the company's benefit may form an independent committee to evaluate the suit. Once such a committee concludes that further prosecution of the suit is not in the company's best interests, may that recommendation form the basis of a court's decision to dismiss or grant summary judgment in the company's favor? These determinations are a matter of state law. *Burks v. Lasker*, 441 U.S. 471, 480, 99 S.Ct. 1831, 1838, 60 L.Ed.2d 404 (1979). Under the facts of this case, the court must apply Maryland law.

The majority rule permits a committee of disinterested and independent directors to move to terminate a derivative action which the committee determines in good faith to be contrary to the corporation's best interests. The leading cases illustrating this principle are *Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979) and *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del.1981). The minority position does not permit a corporation, the majority of whose directors have been named as defendants in the derivative suit, to appoint such a committee. *See Alford v. Shaw, et al.*, 72 N.C.App. 537, 324 S.E.2d 878 (1985); *Miller v. Register & Tribune Syndicate, Inc.*, 336 N.W.2d 709 (Iowa 1983). The plaintiffs in this case have sued the majority of McCormick's directors.

Courts following the majority position have articulated slightly different standards for judicial review of motions to dismiss derivative suits. In *Auerbach*, the court held that the business judgment rule prevented judicial review of the merits of the committee's determination and limited judicial review to an analysis of the independence, good faith, and thoroughness of the committee's investigation. *Auerbach* placed the burden of proof on the plaintiff to show "facts sufficient to require a trial of any material issue of fact as to the adequacy or appropriateness of the *modus operandi* of [the] committee." Some courts have followed *Auerbach*, including the *Grossman* court applying Maryland law. *See Grossman v. Johnson*, 89 F.R.D. 656 (D.Mass.1981) (applying Maryland law in an alternative holding); *Gaines v. Haughton*, 645 F.2d 761 (9th Cir.1981); *Genzer v. Cunningham*, 498 F.Supp. 682 (E.D.Mich.1980).

*Zapata,* a decision by the Delaware Supreme Court, took the *Auerbach* test one step further and, in addition, placed the burden of proof on the corporation. The first step of the *Zapata* test is identical to the *Auerbach* test except for the shift in burden of proof. 430 A.2d at 788. If the court determines that the committee is independent, acted in good faith, and had reasonable bases for its conclusion, then *Zapata* requires the court to proceed with a second step. It must then determine, applying its own business judgment, whether the motion should be granted. 430 A.2d at 789. Several courts have applied the *Zapata* test. *See Joy v. North,* 692 F.2d 880, 891 (2d Cir.1982); *Abella v. Universal Leaf Tobacco Co.,* 546 F.Supp. 795, 799–800 (E.D.Va.1982) (applying Virginia law); *Watts v. Des Moines Register & Tribune,* 525 F.Supp. 1311, 1326 (S.D. Iowa 1981).

### The Parties' Arguments

In its memorandum, McCormick suggests that the court should follow the majority rule in its evaluation of the instant motion. It favors application of the *Auerbach* line of cases but asserts that the composition, methodology and conclusions of the Committee withstand scrutiny under the *Zapata* test.

In response, the plaintiffs assert that Maryland law, specifically Maryland General Corporation Law, § 2–411, does not permit the appointment of a litigation review committee. That section authorizes corporate boards of directors to appoint committees to exercise their powers. There is no specific mention of litigation review committees. Other courts have found similar statutory language sufficient to authorize the formation of litigation review committees. *See e.g. Zapata,* 430 A.2d at 782; *Abella,* 546 F.Supp. at 798.

Next, plaintiffs assert that the business judgment rule, which has been adopted in Maryland, *see Parish v. Maryland & Virginia Milk Producers Ass'n,* 250 Md. 24 (1968), is not applicable to "insider transactions" of the type alleged in this case. Since the business judgment rule provides the underlying rationale for the appointment of a litigation review committee, plaintiffs reason that such committees should not be permitted in insider cases.

Assuming the court decides that the appointment of a committee is within the Board's power under Maryland law, plaintiffs assert that the court should follow the *Zapata* line of cases. They assert that McCormick cannot meet its burden under this test because its Committee was not independent. Specifically, plaintiffs question the independence of Committee member George V. McGowan. Mr. McGowan serves as president and chief operating officer of Baltimore Gas and Electric Company ("BG & E"). Mr. Wells, a defendant director of McCormick, also serves as a director of BG & E. Plaintiffs believe Mr. Wells had significant influence over Mr. McGowan's compensation from BG & E. McCormick disputes that allegation.

Plaintiffs next argue that the committee's investigation was not performed in good faith and was, in fact, a sham. They base this argument on the activities of predecessor committees with respect to another piece of litigation arising out of the Sandoz takeover attempt, *Taubman, et al. v. McCormick, et al.,* ("the accounting cases"). Specifically, plaintiffs assert that the committees did not function at all except to authorize the payment of the legal expenses of the individual director defendants in that case. They also believe that the Committee at issue here acted improperly with respect to another case, *Augenstein v. McCormick & Co., et al.,* HM81–1491. They assert that after this court's decision to dismiss that case, *see Augenstein v. McCormick & Co.,* 581 F.Supp. 452 (D.Md.1984), the Committee approved Piper and Marbury's recommendation that the corporation pay attorney's fees to plaintiffs' attorneys so as to prevent the taking of an appeal. Plaintiffs believe the Committee took this action without any investigation, without notification to the shareholders, and without a court order.

With regard to the Committee's investigation of *Rosengarten,* plaintiffs allege that Mr. McGowan admitted the Committee

had already made up its mind to recommend dismissal prior to interviewing the Sandoz officials. Plaintiffs also believe the Committee should have interviewed some of Sandoz Swiss officials rather than relying on interviews of the two individuals located in the United States. They assert that the committee tried to "sweep under the rug." In support of that assertion, they point to certain sentences and phrases which appeared in the Committee's draft report but were not included in the final version.

*The Hearing Testimony*

One member of the Committee, Erskine N. White, Jr., and its principal counsel, Dean Michael J. Kelly, testified at the May 17, 1985 hearing. Both outlined the formation and operation of the Committee and discussed its conclusions. The court will summarize certain relevant aspects of their testimony below.

During his direct examination, Mr. White indicated that he was acquainted with defendant Harry K. Wells prior to his election as a McCormick director. Mr. Wells asked Mr. White to become a director while both were co-directors of the National Association of Manufacturers. The board of directors of that organization has approximately 200 members.

When questioned about the Committee's investigation, Mr. White indicated that the Committee had intended to conduct all interviews itself. The members developed sufficient trust in counsel, however, that they determined to permit counsel to conduct some interviews, reserving the right to reinterview any witness. On cross examination, Mr. White indicated that no committee members were present when counsel interviewed the two Sandoz officials, Messrs. Burt and Meyer. The Committee kept minutes of all of its meetings. Similar minutes were kept of all interviews conducted by counsel. Dean Kelly was the Committee's reporter. No conscious decision was made not to use a stenographer; the Committee was satisfied with the notes taken by Dean Kelly. Dean Kelly submitted draft minutes to the Committee

members for their comment. He then revised the minutes accordingly.

Mr. White testified that the drafting of the Committee's report began at the April 1984 meeting. This meeting occurred before the Committee interviewed plaintiff's counsel. That interview had been scheduled prior to the April meeting but was postponed at Mr. Bizar's request. Mr. White insisted that the Committee had not reached a final decision at the April meeting. He acknowledged that some tentative conclusions had been reached but indicated that the Committee remained "flexible."

Mr. White then went on to summarize the report. He testified that he and the other Committee members had examined the motives of the McCormick directors and their decision making in the Sandoz affair. The Committee concluded that the McCormick board legitimately relied on the expert financial advice it received. The Committee also considered the other factors on which the board relied, the disruptions to the company and the diversion of management's time caused by the takeover attempt, to be reasonable considerations. The Committee ultimately concluded that the board's action was fair and reasonable and that self interest did not enter into the decision. On cross examination, Mr. White indicated that the Committee did not investigate specifically the amount of money the Company spent in defense of the takeover.

Finally, Mr. White stated that he and the other Committee members did not feel any need to go to Switzerland to interview Sandoz officials there. He testified that the Committee viewed Mr. Meyers, an American Sandoz official who was interviewed here, as the major player in the takeover. In addition, he indicated that McCormick never told the Committee that it could not undertake investigation in Switzerland.

Dean Kelly reiterated many of the same points made by Mr. White. He testified that his function was to establish the independence and integrity of the Committee. To that end, he requested that McCormick and its counsel, Piper & Marbury, not be involved in the investigation. He also rec-

ommended that the Committee engage a securities lawyer from outside of the Baltimore area. Dean Kelly and Mr. McGowan conducted interviews of potential candidates and ultimately selected Mr. Phillips.

Dean Kelly testified that he kept minutes of the Committee's meetings and that he tried to make those minutes as accurate and comprehensive as possible. He submitted drafts to the members and revised the minutes as they requested.

Dean Kelly testified that he too felt a trip to Switzerland was unnecessary. He believed the Committee had learned enough from the interviews of Meyer and Burt. He also testified that the Committee was never told that it could not go to Switzerland.

With respect to Mr. McGowan's prior association with Mr. Wells, Dean Kelly indicated that he was unaware of the relationship until recently. He also testified that he conducted no investigation into Committee members' affiliations with the individual defendants.

*Analysis and Conclusions*

In order to resolve the issue before it, the court must make a number of determinations. First, it must decide whether Maryland law permits a board of directors, the majority of whose members are named as defendants, to appoint an independent litigation review committee to consider the advisability of pursuing the claims in a stockholder derivative suit. If the answer to that question is yes, the court must then decide which of the two tests to apply in evaluating the Committee's composition, investigation and conclusions. Finally, the court must apply the applicable test to the facts of this case. It embarks upon this task without the assistance of Maryland precedent.

A. *The Board has power to appoint a special litigation committee*

■ The defendants correctly state that most courts do permit a board, the majority of whose members are derivative suit defendants, to appoint an independent committee. *See e.g. Hasan v. Clevetrust Realty Investors,* 729 F.2d 372 (6th Cir.1984)

(applying Massachusetts law); *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1982) (applying Connecticut law); *Lewis v. Anderson,* 615 F.2d 778 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980) (applying California law); *Abbey v. Control Data Corp.,* 603 F.2d 724 (8th Cir.1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 670, 62 L.Ed. no calls (1980) (applying Delaware law), *Grossman v. Johnson,* 89 F.R.D. 656, 662–63 (D.Mass.1981) (applying Maryland law); *Zapata v. Maldonado,* 430 A.2d 779 (Del. 1980) (applying Delaware law); *Auerbach v. Bennett,* 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979) (applying New York law); *see also* 13 *Fletcher's Cyclopedia of Corporations,* § 5963 (1984). These courts reach this conclusion for the following reason.

> 'To allow one shareholder to incapacitate an entire board of directors merely by leveling charges against them gives too much leverage to dissident shareholders.'

*Zapata,* 430 A.2d at 785, *quoting, Lewis,* 615 F.2d at 783.

Plaintiffs have only cited two cases to the contrary, *Miller v. Register and Tribune Syndicate, Inc.,* 336 N.W.2d 709 (Iowa 1983) and *Alford v. Shaw,* 72 N.C.App. 537, 324 S.E.2d 878 (1985). In *Miller,* the Iowa Supreme Court held that § 491 of that state's corporate law, a provision enacted in 1847, did not permit a nonindependent board of directors to appoint a special litigation committee. It reached this conclusion because of the statute's silence with regard to a broad delegation of corporate powers by the board and the structural bias it believed to be inherent in the special litigation committee device. *See Miller,* 336 N.W.2d at 713, 718. The *Miller* court also relied on the conclusions expressed in § 7.03 of Tentative Draft No. 1 of *Principles of Corporate Governance and Structure: Restatement and Recommendations* (April 1, 1982) of the American Law Institute. This draft was not approved by the Institute. *See* Goldstein, *Dynamics of Corporate Control: Future Articulation of Corporate Law,* 39 Bus.Law 1541, 1547–

48 (Aug. 1983). Moreover, the reporters have changed the position set forth in the first draft and, as set forth in the most recent draft, have rejected the *Miller* decision. Their current position is as follows:

> A few decisions—most notably, *Miller v. Register & Tribune Syndicate*, 336 N.W.2d 709 (Iowa 1983)—have held that when all, or nearly all, the directors are named as defendants, the board cannot create a litigation committee by expanding its ranks and appointing the newly added directors to the committee. Section 7.10 does not adopt this sweeping a rule, which could prevent the corporation from advancing legitimate justifications for dismissal.

*Principles of Corporate Governance Analysis and Recommendations,* § 7.10, comment d at p. 137 (Discussion Draft No. 1, June 3, 1985).

In *Alford v. Shaw,* the North Carolina Court of Appeals adopted the *Miller* rule. It did so after reviewing extensive authority to the contrary. The court relied, at least in part, upon recently enacted sections of North Carolina law favoring suits by minority shareholders. *See* slip op. at 4. It acknowledged that similar statutory provisions do not exist in most states. In particular, Maryland law does not contain such provisions.

Having reviewed the authority on both sides of this issue, the court has concluded that Maryland would follow the majority rule and permit an interested board of directors to appoint a special litigation committee of independent directors to review a pending derivative suit. It reaches this conclusion because of the absence of statutory provisions similar to those discussed by the Iowa and North Carolina courts in the Maryland Code. In addition, it subscribes to the position taken by the *Zapata* court that one shareholder should not be able to incapacitate an entire board merely by leveling charges against it. *See Zapata,* 430 A.2d at 785.

## B. *The Zapata rule should apply*

 Next, the court must consider whether to limit its inquiry to the Commit-

tee's independence and good faith in accordance with the *Auerbach* decision or to also apply its own business judgment to the Committee's conclusions as the Delaware court did in *Zapata.* In this connection, the court notes that one federal court already has concluded Maryland would apply the *Auerbach* rule. *See. Grossman v. Johnson,* 89 F.R.D. 656, 664 (D.Mass.1981). The *Grossman* decision predates *Zapata,* however, so it is not particularly instructive.

The more recent cases the court has examined reveal a preference for the *Zapata* test. *See e.g. Hasan v. Clevetrust Realty Investors,* 729 F.2d 372, 379–80 (6th Cir. 1984) (court discusses both *Auerbach* and *Zapata* tests; appears to prefer *Zapata* ); *Joy v. North,* 692 F.2d 880, 891 (2d Cir. 1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) ("The function of judicial scrutiny of a committee's recommendation is to determine independently whether the action is likely to harm the corporation rather than help it."); *Abella v. Universal Leaf Tobacco Co.,* 546 F.Supp. 795, 799 (E.D.Va.1982) (court finds reasoning in *Zapata* persuasive). These courts have concluded that the *Zapata* approach better balances the competing interests of the minority shareholder and the board. Judge Merhige commented as follows:

> The Delaware Supreme Court showed its sensitivity to the danger of giving minority shareholders the power to embroil the corporation in ill-founded litigation pursuant to the minority rule, as well as the danger of allowing the board of directors to appoint a few "good ol' boys" as a special litigation committee and to be accordingly whitewashed pursuant to the majority rule. While the Court recognizes the limitations of its own expertise in applying its business judgment to the decision as to dismissal, it also recognizes the relative ease with which a committee could construct a record of apparently diligent investigation after having predetermined the outcome of the investigation. The Court is persuaded that the *Zapata* approach adequately safe-

guards the competing interests at stake....

*Abella,* 546 F.Supp. at 799.

The court notes that a number of commentators have found fault with the *Auerbach* approach because it does not acknowledge the structural bias inherent in a system which allows directors to judge the actions of their fellow directors. *See e.g.* Brudney, V. "The Independent Director: Heavenly City or Potemkin Village," 95 *Harv.L.Rev.* 597 (1982); G.W. Dent, Jr., "The Power of Directors to Terminate Shareholder Litigation: The Death of the Derivative Suit?" 75 *Nw.U.L.Rev.* 96 (1980). The court agrees with these commentators and with the courts that have followed *Zapata.* Accordingly, the court finds that Maryland would be likely to apply the *Zapata* test to the instant case.

As indicated earlier, *Zapata* places the burden on the corporation to demonstrate that its special litigation committee was independent, that the investigation was conducted in good faith, and that the committee had a reasonable basis for its conclusion. *Zapata,* 430 A.2d at 788. In this case, plaintiffs contend that the defendant has not met its burden on any of these three prongs.

### C. *The Committee was independent*

■ The three members of the Committee, Messrs. White, Cook and McGowan, were appointed to the McCormick board after the actions at issue in *Rosengarten* took place. Plaintiffs do not question the independence of Mr. Cook. They do assert that Messrs White and McGowan have some prior connections to the defendant members of the McCormick board. The court finds that Mr. White's connection to Harry Wells, one of the individual defendants, is not a sufficient basis to question his independence. At the hearing, Mr. White testified that he met Mr. Wells when both were directors of the National Association of Manufacturers. The board of that organization has over two hundred members. Cook dep. at 86. Aside from this acquaintance with Mr. Wells, Mr. White had no prior connections to McCormick before joining its board.

Plaintiffs make their most serious allegations against Mr. McGowan. Mr. McGowan serves as president and chief operating officer of the Baltimore Gas and Electric Company ("BG & E"). Defendant Wells serves as a director of BG & E. Plaintiffs point out that Mr. Wells was a member of BG & E's management committee and that the committee made recommendations concerning BG & E officers' compensation including compensation for Mr. McGowan. In response, McCormick notes that Bernard C. Trueschler, the chairman and chief executive officer of BG & E, initiates the recommendation for Mr. McGowan's compensation. He then meets with the management committee. McGowan dep. at 81–82. The management committee does not meet with McGowan. It simply makes recommendations to the full board of BG & E. McGowan dep. at 14–15. Furthermore, McCormick points out that the 1984 compensation recommendations were made after Mr. Wells stopped serving on the Committee. The 1983 recommendations were made six months before Mr. McGowan joined the McCormick board.

Mr. McGowan did not testify at this court's hearing. In his deposition, however, he did state that his judgment as a member of the Committee was not influenced in any way by Mr. Wells' directorship at BG & E. McGowan dep. at 81. Mr. White testified that Mr. McGowan's actions as a member of the Committee did not differ from those of the other two members. Under these circumstances, the court is satisfied that McCormick has demonstrated Mr. McGowan's independence. Other cases have found a committee member to be independent even though the relationships were more extensive. Thus, in *Kaplan v. Wyatt,* 484 A.2d 501 (Del.Ch. 1984), a committee member who was a major shareholder and director of companies which had business relationships with the corporation totalling many millions of dollars was found to be independent. In *Genzer v. Cunningham,* 498 F.Supp. 682 (E.D. Mich.1980), one of the committee members was a paid consultant to the company and found to be independent. In *In re General*

*Tire & Rubber Co. Sec. Litigation,* 726 F.2d 1075, 1084 (6th Cir.1984), the circuit court affirmed the district court finding that the committee was independent even though one member was a partner in the law firm retained by the company and the other had conducted an investigation of the company's corporate practices in Chile.

### D. *The Committee acted in good faith*

In support of its assertion that the Committee acted in good faith and that its conclusions have a reasonable basis, McCormick refers the court to the affidavits of the Committee members and counsel and the Committee's lengthy report. The affidavits each end with the following statement:

> In reaching the above conclusion [to recommend dismissal of the *Rosengarten* action], I was mindful of my fiduciary duty as a director to act in the best interests of McCormick and its shareholders. I believe that the investigation and ultimate determination of the Committee faithfully discharged that fiduciary duty.

The Committee's report contains 33 pages of text and several exhibits including biographical sketches of Committee members and resumes of counsel. In addition, summaries of interviews conducted by the committee or by counsel, minutes of the Committee's meetings, a summary of the Committee's interview with plaintiffs' counsel, and a chart of the movement and volume of McCormick stock during the takeover period are also attached. The court has reviewed the report.

The plaintiffs argue that the Committee's investigation was not conducted in good faith and was, in fact, a sham. In support of their argument they point to the behavior of a predecessor committee which dealt with the class action suits brought against McCormick for alleged false financial statements in the 1977–80 period— *Taubman, et al. v. McCormick, et al.,* (the accounting cases), and this Committee's actions in settling another related case, *Augenstein v. McCormick & Co.,* HM81–1491.

Plaintiffs assert that the predecessor committee which dealt with the accounting cases did nothing more than authorize payment of the legal expenses of the individual defendants, a practice plaintiffs contend was improper. McCormick believes the authorization of interim legal expenses was not improper, *see* Md.Corps. & Assoc.Code Ann. § 2–418, and that the predecessor committee's actions are, in any event, irrelevant to the issue before this court. The court agrees with both propositions.

This court dismissed the *Augenstein* action on February 27, 1984. Plaintiffs assert that the Committee, which also monitored the *Augenstein* case, agreed to Piper and Marbury's recommendation that McCormick pay plaintiff's lawyer's fees to prevent the taking of an appeal. The payment was made without notice to the shareholders and without court approval.

■ The case law does not require shareholder notice or court approval prior to postjudgment settlement of a class action. *Clarke v. Greenberg,* 296 N.Y. 146, 71 N.E.2d 443 (1947), a case cited by plaintiffs in support of their argument, was a derivative suit, not a class action. The remaining cases cited by the plaintiffs similarly do not support their position.

Plaintiffs next argue that the Committee reached its decision to recommend dismissal prior to its interview with their counsel. They submit that this behavior indicates the Committee did not approach the investigation in good faith. This argument finds its genesis in a comment made by Mr. McGowan in his deposition that the Committee had reached tentative conclusions at the time of its April 16, 1984 meeting. *See* McGowan dep. at 65. The particular question and answer are as follows:

> Q: And did you reach a determination prior to the preparation of that report as to what your conclusions were going to be?

> A: I think we concluded pretty much what is in the report and had that discussion with counsel and with Dean Kelly which really formed the basic outline of the report itself.

In response, McCormick asserts that plaintiffs have mischaracterized Mr. McGowan's deposition testimony. They point out that, by April 16, the Committee had interviewed all but four of its witnesses. The interview with plaintiffs' counsel originally had been scheduled earlier but was postponed at Mr. Bizar's request. The Committee was operating at a fast pace because plaintiff's attorney had agreed to only a 120-day stay on the commencement of merits discovery. Ninety of the 120 days had passed by April 16. Mr. White testified at both his deposition and at the hearing regarding the April 16, 1984 meeting. He indicated that the decision on April 16 was not final, that the decision process was ongoing, and that the Committee considered the evidence it received after that date. *See* White dep. at 111–13.

The court finds that a tentative conclusion reached after the Committee had interviewed many of the individuals involved in the Sandoz affair does not taint the Committee's final recommendation. Indeed, the absence of such a tentative conclusion would, in the court's mind raise more suspicion. The Committee should not be restricted to the standards applicable to a jury. Indeed, it should conduct itself as it would if it were making any important business decision. Messrs. White and McGowan's candor in telling plaintiffs' counsel that the Committee had reached tentative conclusions by April 16 reflects positively on their good faith.

Next plaintiffs argue that the Committee did not choose to interview any Sandoz representatives until after their counsel suggested such interviews to it on April 24, 1985. In addition, they point out that no effort was made to interview any Swiss Sandoz officials. They suggest that McCormick told the Committee it would not fund an investigatory trip to Switzerland.

McCormick has not responded to plaintiffs' argument about the timing of the Sandoz interviews. In the court's mind it is the content of those interviews, not the date on which they occurred which is important. The interviews were quite comprehensive and indicate the Committee was genuinely interested in finding out how Sandoz officials perceived the situation. *See* Ex. C–1, C–12.

The Committee's failure to interview Messrs Dunant and Moret, two Swiss-based Sandoz officials, is also not an important omission. The summaries of the Burt and Meyer interviews indicate that these individuals considered themselves the main Sandoz players in the takeover drama. Both Mr. White and Dean Kelly testified that McCormick never indicated it would not finance an investigatory trip to Switzerland to interview Dunant and Moret. Kelly and White indicated that the Committee did not see a need to conduct such interviews in light of Meyer's and Burt's comments. *See* McGowan dep. at 71.

Plaintiffs also point to certain discrepancies between the draft Committee minutes prepared by Dean Kelly and the final versions published in the Committee's report as evidence that the Committee's investigation was a sham. Both Dean Kelly and Mr. White testified to the manner in which minutes were prepared and edited. The court has examined the passages identified by the plaintiffs. It finds that the revisions of the drafts are either insignificant or were adequately explained by Kelly and White in their testimony.

Next, the plaintiffs attack certain of the Committee's procedures. They assert that a stenographic record of Committee meetings should have been kept. Mr. White testified that the Committee never considered using stenographers because it was satisfied with Dean Kelly's minutes. Similarly, the court believes the minutes mechanism provided sufficient recordation of the Committee's activities. *See Kaplan v. Wyatt,* 484 A.2d 501, 514 (Del.Ch.1984).

Plaintiffs also complain that all Committee members were not present at witness interviews. In fact, some interviews were conducted by counsel alone. Dean Kelly prepared written summaries of all interviews, including those conducted by counsel alone, for the Committee's review. Mr. White testified that the Committee originally intended to be present at all interviews but that its confidence in counsel and the

time pressure dictated that counsel should conduct some interviews alone.

Other courts have accepted special litigation committee recommendations even though counsel and not the committee has conducted some or all witness interviews. *See e.g. Grossman v. Johnson,* 89 F.R.D. 656, 664 (D.Mass.1982); *Genzer v. Cunningham,* 498 F.Supp. 682, 694–95 (E.D. Mich.1980); *Abella v. Universal Leaf Tobacco Co.,* 546 F.Supp. 795, 801 (E.D.Va. 1982). The court has read the interview summaries prepared by Dean Kelly and finds that these summaries reflect comprehensive inquiry into the issues before the Committee. In addition, the court heard testimony that the Committee retained the right to interview any witness originally interviewed by counsel. Some reinterviews apparently occurred. *See* White dep. at 75–76. Under these circumstances, the court finds that the Committee's interview procedure was adequate.

Plaintiffs also assert that counsel's document review was inadequate. Specifically, they note that Piper and Marbury, counsel to the individual defendants in *Rosengarten,* chose the documents to be reviewed. During counsel's interview of the Piper and Marbury attorneys, *see* Ex. C–7, Piper and Marbury agreed that the Committee's counsel should have access to all of the firm's files with the exception of "extraneous materials relating to other clients of Piper & Marbury." The Committee's counsel, whose independence the plaintiffs have not challenged, subsequently reviewed the documents and reported to the Committee that the documents did not conflict with the information the Committee received in the interviews. White dep. at 90, McGowan dep. at 62. The court finds that this procedure was not inherently biased or inadequate.

Finally, the plaintiffs challenge the Committee's decision not to employ its own expert to evaluate the financial information provided to the McCormick board during the Sandoz affair by its investment bankers, Alex Brown & Sons and Lehman Brothers Kuhn Loeb, Inc. This criticism is based on the accounting problems, an issue dealt with in the *Taubman* cases. In response, McCormick indicates that both Alex Brown and Lehman Brothers are reputable firms with national reputations. It further notes that the record shows the accounting problems were not known to the board at the time of the Sandoz overture. *See* Ex. C–6. In light of the Committee's assignment to determine whether the board acted in good faith and in accord with the business judgment rule *at the time of the Sandoz overture,* this court finds that the Committee was not required to retain its own financial experts. The Committee's function was not to second guess the McCormick board with the advantage of hindsight but to determine if the board's actions were reasonable and proper at the time.

As the foregoing discussion indicates, the court is satisfied that McCormick has met its burden to show the Committee's independence. In addition, McCormick has shown the Committee pursued its investigation in good faith.

E. *The Committee had a reasonable basis for its conclusions and those conclusions are consistent with the court's own judgment*

The final two prongs of the test, whether the Committee had reasonable bases for its conclusions and whether the court believes, in an exercise of its own business judgment, that the suit should be dismissed are related. The *Zapata* rule forces the court to rely upon the record generated by the Committee in making both determinations. Having reviewed the report, the court finds ample support for the Committee's conclusions that the McCormick board's decisions to resist the $37 cash merger offer, to file suit against Sandoz, and finally to settle the suit by purchasing Sandoz' McCormick shares for $28 were reasonable business decisions which did not violate the directors' fiduciary duties to the shareholders. The court agrees with the Committee that these decisions must be examined not individually but as part of an ongoing process.

Prior to rejecting the $37 cash merger offer, the board received advice from two investment bankers and two law firms. Three of the firms in question had long standing familiarity with the company. The board considered the offer and then voted to reject it by secret ballot. The board subsequently authorized the filing of suit on the advice of its attorneys. Such suits are commonplace in the takeover context. Although the principals in the law firms concede that such a suit would have been difficult to win, they submit that it was not frivolous. They also submit, and the interviews with Sandoz officials confirm, that the suit made McCormick's position clear to Sandoz at a time when it was adopting a "wait and see" approach.

Finally, the settlement of the suit and the concommitant buy-out also occurred on the advice of counsel. The record indicates that the board originally was very reluctant to pay a premium to Sandoz in order to remove it from the picture. It did so only after receiving advice that the buy-out would not harm McCormick financially that Sandoz was unlikely to rid itself of the shares on the open market, that continued prosecution of the suit would be harmful to McCormick both financially and in the diversion of management time, and that the buy-out would be likely to restabilize the market for McCormick stock. Personal considerations did not enter into the buy-out decision.

Moreover, plaintiffs' allegation that the McCormick directors acted out of self interest is directly refuted by evidence that Sandoz intended to retain management and that management itself refused to vote golden parachute contracts. *See Abella*, 546 F.Supp. at 802. Also management, each of whom were substantial stockholders, stood to gain financially, not lose, from acceptance of the $37 offer.

For all of the foregoing reasons, the court finds that the Committee's composition, investigation, and conclusions pass muster under the *Zapata* test. Accordingly, the court will grant the instant motion for summary judgment. The court will enter a separate order embodying the rulings outlined above.