5 A.3d 106

**John L. BOLAND, et al.**

v.

**Sean F.X. BOLAND, et al.**

**No. 2796, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 14, 2010.

---

478

480

482

Joseph P. Suntum (Miller, Miller & Canby, Chrt., on the brief), Rockville, for appellant.

Michael F. Flynn & John M. Quinn (Erin Schiesel, Gleason, Flynn, Emig & Fogelman and Michael J. McAuliffe, Ethridge, Quinn, McAuliffe, Rowan & Hartinger, on the brief), Rockville, for appellee.

Panel: EYLER, DEBORAH S., MATRICCIANI and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

This is an appeal in a "demand refused" shareholder's derivative action. In the Circuit Court for Montgomery County, John Boland and Kevin Boland, the appellants, as shareholders in Boland Trane Associates, Inc. ("BTA"), and Boland Trane Services, Inc. ("BTS") ("the Corporate Appellees" or "the corporations"), sued four members of the corporations' Boards of Directors—Sean Boland, James Boland, Louis Boland, Jr., and Lawrence Cain, Jr. (the "Director Appellees")—and the corporations, alleging, among other things, that the Director Appellees had engaged in self-dealing transactions to the detriment of the corporations.

The corporations' Boards of Directors appointed a Special Litigation Committee ("SLC") to investigate the derivative claims and determine whether to pursue them. After five months of study, the SLC issued a report concluding that the claims had no merit and recommending that the corporations not pursue them and seek to have them dismissed. Ultimately, the circuit court deferred to the SLC's decision, under the business judgment rule, and granted summary judgment in favor of the Director Appellees and the corporations. This appeal followed.

The appellants pose three questions for review, which we have reworded: [1]

---

1. The appellants phrase the questions as follows:

I. Are the Circuit Courts prohibited from independently reviewing the conclusions of corporate litigation committees seeking to terminate derivative actions when it is undisputed that the litigation committee failed to apply the proper standard of review in its investigation?

II. Should a self-dealing transaction between a corporation and its Board Members be critically reviewed by the circuit courts under the entire fairness test, or must the circuit courts defer to the asserted business judgment of the Board Members' self-selected litigation committee?

I. Did the circuit court err in reviewing the SLC's decision under the "business judgment rule" and not by applying its own "independent business judgment," under *Zapata v. Maldonado*, 430 A.2d 779 (Del.1981)?

II. Did the circuit court err in finding the SLC's investigation reasonable even though the SLC did not review the derivative claims of self-dealing under the "entire fairness test"?

III. Did the circuit court err in granting summary judgment on the derivative complaint because there exist numerous disputes of material fact?

For the reasons discussed below, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

BTA and BTS are related, closely held Maryland Subchapter S corporations with their principal place of business in Montgomery County. They are in the business of selling, distributing, and servicing heating, ventilation, and air conditioning equipment. The corporations were founded by Louis Boland, Sr., after he contracted with the Trane Company, in the early 1960's, to be its exclusive sales franchise agent for the District of Columbia metropolitan area.[2]

Initially, Louis, Sr., and his wife, Maureen, owned all the outstanding stock of the corporations.[3] Over the years, however, the two corporations issued stock to the couple's eight children: Colleen (deceased on June 7, 2006), Louis, Jr., Sean, James, John, Kevin, Michael, and Eileen. A few long-term employees, including Cain, also were issued stock.

---

III. May a Circuit Court grant summary judgment on a derivative complaint when there exist numerous disputes of material fact?

2. The predecessor entities to BTA and BTS were Louis J. Boland, Inc. and Boland Trane Service Agency, Inc., respectively.

3. For the sake of clarity, we shall refer to each member of the Boland family by his or her first name and, if appropriate, suffix.

Louis, Sr. served as the Chairman of the Boards and President of both corporations until his death on September 7, 2003. Afterwards, in accordance with a "Letter of Instruction" setting forth Louis, Sr.'s succession plan, Sean became Chairman of the Boards and Chief Executive Officer of the corporations, James became President and Chief Operating Officer, Louis, Jr. became Executive Vice President and Chief Marketing Officer, and Cain became Senior Vice President and Chief Financial Officer. At the times relevant to this case, all four served on the Boards of Directors of the corporations together with a fifth director, John Heise.[4]

The BTA and BTS independent franchises with the Trane Company are the only such franchises in the United States to have survived beyond the first generation, perhaps because they were profitable long before Louis, Sr.'s death and have increased in profitability since. The franchise agreements are subject to termination by the Trane Company without cause on 30 days notice. In 2008, the Trane Company was purchased by Ingersoll Rand.

Sean is a practicing lawyer in the District of Columbia. He has served on the boards of the corporations for 28 years and as counsel to the corporations for 31 years. His present service as Chairman of the Boards and Chief Executive Officer of the corporations is without compensation. Louis, Jr., and James have been executives with the corporations for over 30 years and have served on the boards for almost 30 years. The other children of Louis, Sr., and Maureen, including the appellants, have not been involved in the operations of the corporations. Cain has been an executive with the corporations for almost 30 years and a member of the boards for about 25 years. Heise, who was a lawyer, had served as corporate counsel to the corporations since they were founded.

In early 2004, Maureen's financial, tax, and estate advisors recommended that an annuity be created to pay for her care,

---

4. Heise died on October 6, 2009. Before that, on May 21, 2007, John Shooshan, a real estate developer, became a member of the Boards of Directors.

which up to that time had been paid for by dividends; that the annuity be funded by BTS; and that BTS acquire Maureen's stock in that corporation. The recommendations were implemented and on June 24, 2004, BTS acquired Maureen's stock, which became part of the authorized but unissued shares of the corporation, *i.e.*, treasury stock.

In the first several months of 2005, two sales of treasury stock in the corporations took place that are at the heart of this case. First, in January 2005, James Boland and Sean Boland, Jr. (Sean's son and an Account Executive at BTS) purchased treasury stock in BTS for $2.16 per share. James purchased 151,150 shares for a total of $326,484. Sean, Jr., purchased 75,075 shares for a total of $162,162. The $2.16 share price was based upon an appraisal obtained on October 11, 2004, and a valuation date of April 30, 2004.

Second, on April 1, 2005, James, Louis, Jr., Cain, and Sean, Jr., bought treasury stock in BTA at $508 per share. James purchased 566 shares ($287,528), Louis, Jr., and Cain each purchased 282 shares ($143,256), and Sean, Jr., purchased 70 shares ($35,560). The $508 share price was higher than the most recent appraised value then available ($377/share) but, as it turned out, was lower than a later appraised value of $761/share that had a valuation date of September 20, 2004, but was not received by BTA until August of 2005.

The stock sales were approved retroactively by the Boards of Directors at a special meeting on April 4, 2005. Sean, Louis, Jr., James, and Cain attended the meeting and voted; Heise was not present.[5] The minutes of the meeting reflect that the compensation plans created by the Executive Compensation Committee for the boards recommended, and the Director Appellees acknowledged, that "it was most desirable to continue the employment" of James, Louis, Jr., Cain, and Sean, Jr., and to "adequately compensate them for their efforts"; and that to attain those goals "it was critical that the compensation plan include an appropriate ownership interest

---

**5.** Heise was not named as a defendant in the derivative action.

in the Corporation's stock." The Director Appellees then passed a resolution authorizing BTA to enter into personal service contracts with James, Louis, Jr., Cain, and Sean, Jr., that would include the stock sales. The resolution called for the shares to be issued in exchange for promissory notes with 9–year terms and at interest rates no greater than those under section 7520 of the Internal Revenue Code. Each director abstained from voting on the resolution as it personally affected himself or, in the case of Sean, his son.

The stock sales first became an issue in litigation in a declaratory judgment action filed by the corporations in July 2006, against the personal representative of Colleen's estate. In that case, the corporations were seeking a court ruling as to the validity of the stock purchase agreement ("SPA") signed by each stockholder in the corporations that provided that, upon the death of the stockholder, the corporation shall redeem the common stock, and the personal representative shall surrender the common stock for redemption, upon payment of its determined price, as calculated by a formula provided in the agreement. The validity of the SPA had become an issue upon Colleen's death.

On March 8, 2007, the appellants sent letters to outside counsel for the corporations making demand upon the Boards of Directors to remedy the alleged self-dealing and stating their intention to file a derivative action on behalf of the corporations against the Appellee Directors if their demands were not satisfied. In particular, the appellants alleged in the letter that the Director Appellees had engaged in self-dealing by "permitt[ing] certain Board Members to purchase stock on favorable terms at below-market values . . . [and] authoriz[ing] the 'sale' of stock to [Sean, Jr.]." The appellants demanded "that the Boards . . . take immediate steps to retain independent counsel for the corporations, answerable to the remaining shareholders directly, to prosecute the Board Members for their breach of duties, investigate other self-serving transactions, and pursue all appropriate remedies."

In response, the Corporate Appellees informed the appellants that their demand letter "would be considered in good faith and disposed of in a manner consistent with the best interests of the corporations" at the board meeting scheduled for May 2007.

Nevertheless, on May 1, 2007, the appellants filed this derivative action, setting forth four counts in their complaint. In Counts I and II, they sought to dissolve the corporations pursuant to Md.Code (2007 Repl.Vol.), section 3–413 of the Corporations & Associations Article ("CA"). They alleged that the Director Appellees were operating BTS and BTA "fraudulently, illegally and oppressively for their own benefit and not for the benefit of all of their shareholders." In Count III, the appellants alleged that the Director Appellees had breached their duties to the minority shareholders. In Count IV, they alleged that the Director Appellees had mismanaged the corporations, engaged in self-dealing, violated the appellants' preemptive rights, and awarded themselves excessive compensation.

That same day, in the declaratory judgment action, the appellants in the case at bar filed a cross-claim that contained the same allegations.

At a special meeting of the Boards of Directors on May 25, 2007, the corporations elected two new, independent directors to function as the SLC to investigate the appellants' demand and recommend whether the corporations should pursue the claims set forth in the derivative action complaint. The new directors were James Cromwell, Esquire, and Charles Wolfe, II, C.P.A. Neither had served on either Board of Directors, nor did either have any business relationship with the corporations, past, present, or expected. The SLC hired Albert Brault, Esquire to serve as its independent counsel. Brault also has had no relationship with the corporations, nor did he expect to. The appellants were told of the formation of the SLC the same day it was established.

On August 2, 2007, upon motion of the Corporate Appellees, the circuit court stayed this action "pending the investigation and issuance of the report from the [SLC]."

On February 1, 2008, the SLC completed its investigation and issued its "Report of the Special Litigation Committee" (the "Report"). The SLC concluded that the Director Appellees had acted within their statutorily defined duties under the business judgment rule with respect to the allegations made by the appellants and recommended that the derivative action be terminated. (We shall discuss certain of the conclusions of the SLC in detail *infra.*)

On February 11, 2008, the Corporate Appellees filed a motion to dismiss the derivative action under Rule 2–502 based on the SLC's recommendation that the corporations not pursue the litigation. The Director Appellees thereafter filed a motion to dismiss or in the alternative for summary judgment. The appellants filed an opposition to the motions.

On June 12, 2008, the court held a hearing on all pending motions. Counsel for the appellants took the position that the court should hold an evidentiary hearing. Counsel for the Corporate Appellees countered by moving into evidence the Report and its Exhibits and depositions of Cromwell and Wolfe and taking the position that the court had before it all of the information it needed to decide the motion to dismiss under Rule 2–502.

The Corporate Appellees then urged the court to apply the business judgment rule to the SLC's recommendation to terminate the derivative action, stating that "[the appellants] have the burden of proving that the proceedings were unreasonable, in bad faith, and that there does not exist a reasonable basis to support the committee's findings and their conclusions." The appellants responded that "the committee process is, in fact, subject to abuse, which is why the law requires [the circuit court] to objectively and independently review the work product." They argued that the circuit court should have applied its own independent judgment, instead of the business judgment rule, in reviewing the decision of the

SLC, and that the SLC should have applied the "entire fairness" test when assessing the stock sales and what the appellants characterized to be other self-dealing transactions.

In a Memorandum Opinion entered on September 5, 2008, the circuit court granted summary judgment in part, leaving in place the claim that Cain had engaged in self-dealing in setting excessive compensation for himself, and the claim that the Appellee Directors had engaged in self-dealing with respect to the stock sales.[6]

The court employed a three-part test to determine whether the SLC wrongfully had refused the appellants' demand. First, it assessed whether the members of the SLC had acted independently and in good faith. The court answered in the affirmative, commenting that neither committee member had "ever been employed by, done business with or provided services for either corporation." Second, the court assessed the reasonableness of the SLC's investigation. It found that the SLC, with assistance of independent counsel, had conducted a "comprehensive" 5 month investigation in which it reviewed approximately 1,716 pages of materials and interviewed 11 people with knowledge pertaining to the claims, all of which resulted in a 30 page report with an appendix and 32 exhibits, and that the investigation was reasonable.

Finally, the court considered whether the SLC's findings and conclusions were reasonable. The court stated that "the legal standard to be applied [in answering that question] depends on the allegation[;] each alleged wrong-doing must be looked at individually to determine which standard need be applied for each separate allegation." The court reviewed each categorical finding detailed in the Report, applying the business judgment rule to all claims except the claim regard-

---

6. At times in its rulings the court stated that it was dismissing all claims and at other times it said it was granting summary judgment. As we shall explain in our discussion of Question III, the motions before the court were accompanied by written material outside the four corners of the complaint, and therefore, to the extent dismissal was requested, the court treated the request as one for summary judgment. *See* Md. Rule 2–322(c).

ing Cain's compensation and the claim regarding the stock sales. To those claims, it applied the "entire fairness test," reasoning that it was required to do so by this Court's opinion in *Bender v. Schwartz*, 172 Md.App. 648, 917 A.2d 142 (2007). The court concluded that it could not find the transactions on which the claims of self-dealing were based "entirely fair," and therefore denied summary judgment on them.

On September 29, 2008, the Corporate Appellees and the Director Appellees filed a joint motion for reconsideration or, in the alternative, for clarification of the September 5, 2008 order. They argued, as they had initially, that under *Bender* the court was required to apply the business judgment rule in assessing the SLC's recommendation as to all claims in the derivative action, including the claims alleging self-dealing.

On December 12, 2008, the court issued a memorandum opinion and order granting the joint motion for reconsideration and further granting summary judgment in favor of all the appellees on all counts of the derivative complaint. The court concluded that it had erred in applying the "entire fairness" standard in reviewing the SLC's demand refusal respecting the claims of self-dealing by directors; rather, under *Bender*, it should have applied the business judgment rule in reviewing the SLC's demand refusal as to all of the derivative claims. It also concluded that it had erred in concluding that the SLC had not investigated the claim of self-dealing respecting Cain's compensation; in fact, that claim had been investigated by the SLC. The court concluded that the transactions underlying the self-dealing claims were acceptable under the business judgment rule, and therefore, in deference to the SLC's decision not to pursue the derivative claims, dismissal was appropriate. As noted above, because the court had considered material outside the record in deciding the motion to dismiss, it treated the motion as one for summary judgment, under Rule 2–322(c), and granted it.[7]

---

7. The court's December 12, 2008 order was mistakenly entered under the case number for the declaratory judgment action brought by the corporations. For a period of time, from June 6, 2007, until March 21,

We shall include additional facts as necessary for our discussion.

## DERIVATIVE ACTIONS

■■■ "The business and affairs of a corporation, including the decision to institute litigation, are managed generally under the direction of its board of directors." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 342, 983 A.2d 408 (2009) (citing *Bender v. Schwartz*, 172 Md.App. 648, 665, 917 A.2d 142 (2007)). A shareholder cannot bring suit, in his or her individual capacity, to "redress an injury to the corporation resulting from directorial mismanagement." *Id.* (citing *Mona v. Mona Elec. Group, Inc.*, 176 Md.App. 672, 697–98, 934 A.2d 450 (2007)). "[A]ny exercise of the corporate power to institute litigation and the control of any litigation to which the corporation becomes a party rests with the directors or, by delegation, the officers they appoint." *Werbowsky v. Collomb*, 362 Md. 581, 599, 766 A.2d 123 (2001).

In *Werbowsky*, the Court of Appeals described the nature and purpose of the shareholder's derivative action:

The shareholder's derivative action was developed in the mid 19th Century as an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf. That right could include the recovery of losses occasioned by self-dealing or fraudulent or grossly negligent misconduct on the part of the corporate directors or officers. As Fletcher describes it:

"The nature of the derivative proceeding is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is [a] suit by the corporation, asserted by the shareholder on its behalf,

---

2008, the two cases had been consolidated. A new order granting summary judgment in place of the December 12, 2008 order was entered on February 5, 2009. In the February 5, 2009 order, the court incorporated the relevant portions of its Memorandum Opinions of September 5, 2008, and December 12, 2008.

against those liable to it. The corporation is the real party in interest and the shareholder is only a nominal plaintiff. The substantive claim belongs to the corporation.... The proceeding typically is brought by a minority shareholder, because a majority or controlling shareholder can usually persuade the corporation to sue in its own name."

13 WILLIAM MEADE FLETCHER ET AL., CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5941.10 (1995 Rev. Vol.); *see also Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984). The fact that the action is on behalf of the corporation, rather than the shareholder, has significant implications, not the least of which is the extent to which the corporation can control the litigation after it has been filed.

362 Md. at 599–600, 766 A.2d 123 (alteration in original).

Before filing a derivative action, a shareholder "either must make a demand on the corporation's board of directors to pursue the claim against the offending parties or demonstrate to the court that such demand would be futile due to the conflicting interests of the members of the board." *Shenker,* 411 Md. at 344, 983 A.2d 408 (citations omitted). "Once demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is in the best interests of the corporation." *Id.* (citations omitted). The board may appoint a demand committee to conduct the investigation. *Bender,* 172 Md.App. at 666, 917 A.2d 142 (citing *Aronson,* 473 A.2d at 813). "If the corporation, after an investigation, fails to take the action requested by the shareholder(s) (*i.e.,* to bring the suit) the shareholder(s) may bring a 'demand refused' action." *Bender,* 172 Md.App. at 666, 917 A.2d 142 (citations omitted).

## DISCUSSION

### I.

The appellants first contend the circuit court erred because, in ruling on the motion to dismiss, it applied the wrong

standard to the conclusions of the SLC. Specifically, they assert that in reviewing the SLC's decision not to pursue the derivative claim alleging self-dealing by the Director Appellees in the sales of stock, the court should not have applied the business judgment rule.[8] Rather, it should have followed the Delaware Supreme Court's lead in *Zapata v. Maldonado,* 430 A.2d 779–89 (Del.1981), and exercised "its own independent business judgment." They maintain that this Court's holding in *Bender* did not mandate that a circuit court reviewing the decision of a demand committee in a wrongful refusal case should apply the business judgment rule, and that *Bender* does not control in any event because this case and *Bender* are distinguishable.[9]

The appellants further assert that the additional scrutiny that comes with the *Zapata* "independent business judgment" standard was necessary here, in particular, because the corporations are "small, closely held, family corporations" as opposed to "large publically traded corporations," and therefore the relationships among the shareholders are like those among partners. For that reason, there are greater fiduciary duties owed by shareholder directors to the other shareholders. The appellants maintain that "[t]he actions of the [Director Appellees], the self-dealing nature of the [alleged] transaction[s], and the willingness of the [SLC] to so easily overlook their conduct required the close scrutiny of the circuit court."

The Corporate Appellees respond that *Bender* does control and, under its holding, the circuit court correctly applied the

---

**8.** The appellants do not contend on appeal that the circuit court erred in its ultimate disposition of the self-dealing claim regarding Cain's compensation. Their arguments focus on the stock sales.

**9.** In their motion to dismiss, the Corporate Appellees cited *Zapata,* arguing that the standard it established did not apply. In their opposition to the motion to dismiss, the appellants argued that the *Zapata* standard did apply. The *Zapata* case was argued to the court during the hearing on the motion to dismiss. The court's memorandum opinions do not discuss the *Zapata* standard. Implicitly, the circuit court ruled that the *Zapata* standard did not apply. The *Zapata* standard issue properly would be before us even if there were no ruling on it below, as it was raised (if not decided) below. Md. Rule 8–131(a).

business judgment rule to the SLC's conclusion that the corporations should not pursue any of the claims alleged in the derivative action, including the claims related to the stock sales. They state that because the appellants "failed to persuade the circuit court that the SLC's investigation or decision lacked independence or good faith ... [and] failed to demonstrate that the conclusions reached by the [SLC] fell outside the realm of sound business judgment" the circuit court properly deferred to the decision of the SLC, under the business judgment rule. The Director Appellees join in this response and also argue that the appellants fail to recognize the distinction between a derivative action and a direct action, stating, "[the appellants'] arguments about duties allegedly owed to them individually have no relevance to this appeal."

The standard for a circuit court to apply in deciding whether to grant a motion to terminate litigation in a demand refused derivative action is a pure question of law. Therefore, we review the circuit court's decision on the issue *de novo*. *Bender,* 172 Md.App. at 664, 917 A.2d 142.

As is obvious, the *Zapata* case was decided under Delaware law. Unlike the case at bar, it was not a demand refused case. Rather, it was a demand excused case, in which the court held that the alleged breaches of fiduciary duty on the part of all the corporation's directors made any demand on the board futile. After the derivative litigation in *Zapata* was initiated, the board established an independent litigation review committee to make recommendations as to whether to pursue the derivative claims. When the committee recommended that the corporation not pursue the claims, the corporation moved to dismiss the derivative action. The trial court—Delaware's Chancery Court—granted the motion to dismiss, applying the deferential business judgment rule. On review, the Delaware Supreme Court reversed, holding that the Chancery Court should have decided the motion to dismiss in a two-step process, by applying the business judgment rule and then exercising its own independent business judgment.

We quote at length the reasoning of the *Zapata* court:

[T]he Court of Chancery ... is faced with a stockholder assertion that a derivative suit, properly instituted, should continue for the benefit of the corporation and a corporate assertion, properly made by a board committee acting with board authority, that the same derivative suit should be dismissed as inimical to the best interests of the corporation.

At the risk of stating the obvious, the problem is relatively simple. If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors.... If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result....

[T]he question has been treated by other courts as one of "business judgment" of the board committee. If a "committee composed of independent and disinterested directors, conducted a proper review of the matters before it, considered a variety of factors and reached, in good faith, a business judgment that (the) action was not in the best interest of (the corporation)", the action must be dismissed. *See, e.g., Maldonado v. Flynn,* [ ] 485 F.Supp. [274] at 282, 286 [S.D.N.Y.1980]. The issues become solely independence, good faith, and reasonable investigation. The ultimate conclusion of the committee, under that view, is not subject to judicial review.

We are not satisfied, however, that acceptance of the "business judgment" rationale at this stage of derivative litigation is a proper balancing point. *While we admit an analogy with the normal case respecting board judgment, it seems to us that there is sufficient risk in the realities of a situation like the one presented in this case to justify caution beyond adherence to the theory of business judgment.*

*The context here is a suit against directors where demand on the board is excused. We think some tribute must be paid to the fact that the lawsuit was properly initiated. It is not a board refusal case.* Moreover, this complaint was filed [four years before the litigation investigation committee was established]. Situations could develop where such motions could be filed after years of vigorous litigation for reasons unconnected with the merits of the lawsuit.

* * *

Whether the Court of Chancery will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal of a derivative action, where a demand has not been initially made, should rest, in our judgment, in the independent discretion of the Court of Chancery.

430 A.2d at 786–88 (footnotes omitted) (some citations omitted) (emphasis added).

The court concluded that, to balance the competing interests of the derivative plaintiffs and the corporation, the Chancery Court, in ruling on a motion to dismiss, first should apply the business judgment rule and then should exercise its independent judgment to decide whether dismissal of the derivative claims based upon the demand committee's recommendation would produce a "result [that] does not appear to satisfy [the business judgment rule's] spirit" or the "premature[ ] termination[ion of] a stockholder grievance deserving of further consideration in the corporation's interest." *Id.* at 789. The *Zapata* court also held that, with respect to the first, business judgment, prong of the two-step process, the burden was on the corporation defendants, not the derivative plaintiffs, to show that the litigation committee had acted independently and in good faith, that its investigation had been reasonable, and that its conclusions were reasonable. *Id.* at 788.

In the *Bender* case, unlike in *Zapata,* but as in the case at bar, a demand was made and refused, and the assertion was that the refusal was wrongful. Two corporations were involved in *Bender;* the board of each established a demand

committee that investigated the plaintiffs' derivative claims. The committees each recommended that the claims not be pursued, and on that basis, the corporations moved to dismiss all the derivative claims. The court applied an "entire fairness" test in reviewing the demand committee's recommendations as to three claims, and applied the business judgment rule in reviewing the demand committee's recommendations as to the remaining claims. It granted the motion to dismiss as to all claims.

On appeal, we explained that, "[i]n determining whether a demand was wrongly refused, a court reviews the board's investigation under the business judgment rule." *Bender*, 172 Md.App. at 666, 917 A.2d 142. We pointed out that the business judgment rule is codified in Maryland. It states that "[a]n act of a director of a corporation is presumed to satisfy the standards of subsection (a) of this section." CA § 2–405.1(e). *See Mona*, 176 Md.App. at 696, 934 A.2d 450 (commenting that "the business judgment rule is a presumption that corporate directors acted in accordance with the standard of care imposed upon them") (citations and quotations omitted). Subsection (a) states, "[a] director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." CA § 2–405.1(a).

We further explained in *Bender* that when the business judgment rule applies to a demand committee's decision not to pursue derivative litigation, the circuit court, in ruling on a motion to dismiss, must defer "to the decision of the board or committee not to pursue litigation unless the stockholders can show either that the board or committee's investigation or decision was not conducted independently and in good faith, or that it was not within the realm of sound business judgment." *Bender*, 172 Md.App. at 666, 917 A.2d 142 (citations omitted). *See also Werbowsky*, 362 Md. at 619, 766 A.2d 123 (stating, "[i]f a demand is made and refused, that decision, and the

basis for it, can be viewed by a court under the business judgment rule standard"). Stated another way, deference must be granted the demand committee's investigation if "any rational business person could have reached that result, proceeding independently and in good faith with the best interests of the corporation in mind." *Id.* at 667, 917 A.2d 142 (citation omitted). *See also* James J. Hanks, Maryland Corporation Law § 7.21[c], p. 276.9 (2009 Supp.) (hereinafter "Hanks") (stating, "[t]he directors' action in considering whether to pursue a possible claim is, like any other action, governed by the standard set forth in [the statutory business judgment rule]. If the demand is properly reviewed and refused, then that is the end of the matter and the stockholder will not be permitted to proceed.") (footnote omitted).

We also explained in *Bender* that the party challenging the demand committee's decision not to pursue the derivative claims bears the burden " 'to establish facts rebutting the presumption' that the directors acted reasonably and in the best interests of the corporation." *Bender*, 172 Md.App. at 667, 917 A.2d 142 (quoting *Aronson*, 473 A.2d at 812).

■ Our ultimate holding in *Bender* concerned the proper application *vel non* of the "entire fairness test," an issue we shall discuss *infra*, as it is pertinent to the appellants' second question presented. It was implicit in our express approval in *Bender* of the business judgment rule as the generally applicable standard for assessing a demand committee's recommendations in a wrongful refusal case, however, that we do not require the circuit court to engage in the *Zapata* two-step "independent business judgment" analysis when ruling on a motion to dismiss in a demand refused case. We shall make express today what was implicit in *Bender*.[10]

---

**10.** In *Scalisi v. Grills*, 501 F.Supp.2d 356 (E.D.N.Y.2007), a derivative action, applying Maryland law, in which the corporation defendant moved to dismiss after a special litigation committee recommended that the claims not be pursued, the plaintiffs argued that the *Zapata* test should apply. The court commented that, "[u]nder *Bender*, it appears that absent facts that rebut the presumption of reasonableness created by the business judgment rule, a Maryland court must defer to the

The *Zapata* independent business judgment standard calls upon the trial court to review the demand committee's conclusions not only for fairness of process, but also for substance so that, even when the requirements of the business judgment rule—independence and good faith of the demand committee, reasonableness of the committee's investigation, and reasonableness of the committee's conclusions—have been satisfied, the trial court may substitute its own judgment for that of the corporation. 430 A.2d at 789 ("This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied."). Thus, under the *Zapata* test, the court's business judgment, not the corporation's, prevails, regardless of how fair and reasonable the corporation's investigation and decision have been. In exercising its final business judgment, the court "should, when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests." *Zapata*, 430 A.2d at 789.

 When the business judgment rule, and not the two-step enhanced process adopted in *Zapata*, prevails, the reviewing court will not substitute its judgment for that of the corporation's directors on a matter of corporate management, *e.g.*, a decision whether the corporation should pursue litigation. *See Auerbach v. Bennett*, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994, 996 (1979) (stating, "the substantive aspects of a decision to terminate a shareholders' derivative action against defendant corporate directors made by a committee of disinterested directors appointed by the corporation's board of directors are beyond judicial inquiry under the business judgment doctrine, the court may inquire as to the disinterested

---

[special litigation committee's] conclusions." *Id.* at 362 (citing *Bender*, 172 Md.App. at 688, 917 A.2d 142). The *Scalisi* court noted, however, that there was no discussion of *Zapata* in *Bender*, and ruled that, even under the more stringent *Zapata* test, the special litigation committee "had a reasonable basis for its conclusion and that conclusion is consistent with the [c]ourt's own judgment." *Id.* (It appears that the *Zapata* case was not argued to this Court in the *Bender* appeal.)

independence of the members of that committee and as to the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee"). In his article, "The Business Judgment Rule as Abstention Doctrine," Stephen M. Bainbridge describes the difference in approach between the traditional business judgment rule and the enhanced independent business judgment rule followed in Delaware as

two conceptions . . . compet[ing] in the case law. One views the business judgment rule as a standard of liability under which courts undertake some objective review of the merits of board decisions. . . . The other . . . treats the rule not as a standard of review but as a doctrine of abstention, pursuant to which courts simply decline to review board decisions.

Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine,* 57 VAND. L.REV. 83 (2004).

In Maryland and elsewhere in this country Delaware corporations law is properly accorded respect. *Werbowsky,* 362 Md. at 618, 766 A.2d 123. There are two distinctions between Maryland corporations law and Delaware corporations law, however, that militate strongly against the application of the *Zapata* two-step enhanced version of the business judgment rule in Maryland.

First, as mentioned above, Maryland's business judgment rule, being statutory, is a product of legislation and, absent ambiguity or constitutional infirmity, is not subject to interpretation or revision by judicial gloss. In contrast, Delaware's business judgment rule remains a creature of common law, liable to judicial alteration. By its plain language, our statutory business judgment rule applies to decisions by a board of directors or its committees, which would include a special litigation committee such as the SLC in this case. *See* CA § 2–405.1(a) (stating that "[a] director shall perform his duties as a director, *including his duties as a member of a committee of the board on which he serves* . . . (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3)With the care that an ordinarily prudent person in a like position would use under similar circumstances.") (emphasis added). *See also* CA § 2–411(a)

("The board of directors of a corporation may: (1) Appoint from among its members ... committees composed of one or more directors; and (2) Delegate to these committees any of the powers of the board of directors [with exceptions not here applicable]. . . .").

■ Likewise, by its plain language, the Maryland statutory business judgment rule places the burden on the derivative plaintiff to prove that a decision by a board of directors or by a committee of the board was not made independently and in good faith, was not investigated reasonably, or was not based upon reasonable conclusions. This is directly contrary to the assignment of the burden of proof in *Zapata.*

Second, as noted, *Zapata* was a demand excused case, not a demand refused case. The Delaware Supreme Court emphasized the nature of the case repeatedly, pointing out that the derivative suit in *Zapata* was "properly initiated" by the plaintiff shareholders. The requirement of a demand most frequently is excused when the board members are so personally interested in the subject of the litigation or so bound to a position about it that demand would be futile. In such a situation, the shareholder plaintiff retains control over the litigation; thus the *Zapata* court's observation about the suit having been properly brought. *Zapata,* 430 A.2d at 785.

■ By contrast, when a shareholder makes a demand, as was done in the case at bar, and in *Bender,* the shareholder has " 'waived any claim [he] might otherwise have had that the board *cannot independently act* on the demand.' " *Bender,* 172 Md.App. at 666, 917 A.2d 142 (quoting *Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70, 74 (Del.1997)) (emphasis in *Bender*). In that instance, control of the litigation is with the corporation, as usual, and, also as usual, the corporation's decision, through the appointed committee, whether to pursue the derivative claims, is protected by the business judgment rule.[11]

---

**11.** It is worth noting, as well, that the Delaware court system is structured so that trial level decisions in derivative actions are made by the Chancery Court, which

■■■■■■ We see no merit in the appellants' argument that, because their claims are based upon allegations they characterize as self-dealing by directors, the court should apply the *Zapata* test and decide the motion to dismiss by application of its own business judgment. In a demand refused action, where demand was not excused under the futility doctrine based upon the self-interest of directors, the court is reviewing the demand committee's decision not to pursue the derivative litigation, not the underlying actions that prompted the investigation. The business judgment rule "applies to *all decisions* regarding the corporation's management," which "insulate[s]

is widely recognized as the nation's preeminent forum for the determination of disputes involving the internal affairs of the thousands upon thousands of Delaware corporations and other business entities through which a vast amount of the world's commercial affairs is conducted. Its unique competence in and exposure to the issues of business law are unmatched.
*http://courts.delaware.gov/Courts/court% 20of% 20chancery/?index.htm*
*(last visited July 28, 2010).* The Chancery Court is a general equity court, not a court of law, and does not hear all equity cases, in that family law cases in Delaware come before a separate family law court. Thus, the Chancery Court's docket is substantially comprised of business dispute cases. The court, in essence, is a specialty body that concentrates on business law disputes. It routinely publishes opinions on business law issues.

By contrast, in Maryland, the circuit courts are of general jurisdiction, law and equity, civil and criminal. They are general, not specialty, courts. Within our circuit courts, there now is a business and technology case management program, established in 2003 by Rule 16–205, in which a small number of specially trained judges may be assigned cases "present[ing] commercial or technological issues of such a complex or novel nature that specialized treatment is likely to improve the administration of justice." Md. Rule 16–205(c). The business and technology judges publish some of their opinions, to create a database that is useful to other judges, lawyers, and litigants. *See generally http://www.courts.us./businesstech/index.html.* Indeed, in *Costa Brava Partnership III, L.P. v. Telos Corp.,* Case No. 24–C–05–009296 in the Circuit Court for Baltimore City, Judge Matricciani, now a member of this Court, published an opinion ruling, for reasons we endorse, that the *Zapata* standard does not apply in a demand refused derivative action. Even with the business and technology case management program, however, the Maryland circuit courts do not have the broad expertise in corporation law that the Delaware Chancery Court has developed through many years of specialization.

the business decisions made by the director from judicial review, absent a showing of fraud, self-dealing, unconscionable conduct, or bad faith." *Shenker,* 411 Md. at 344, 983 A.2d 408 (emphasis added). The SLC's decision not to pursue the derivative claims was a business decision separate and apart from the underlying business decisions that the SLC was investigating. Thus, the circuit court was obligated to apply the business judgment rule to the decision not to pursue the derivative claims unless the appellants introduced evidence that the SLC members themselves engaged in fraud, self-dealing, unconscionable conduct, or bad faith in conducting their investigation and making their recommendations. *Bender,* 172 Md.App. at 666–68, 917 A.2d 142.

Accordingly, in a Maryland demand refused derivative action, the business judgment rule serves as one of abstention, by which the courts will defer to the decision of a special litigation committee on whether to pursue the claims at issue, so long as the committee acted independently and in good faith, conducted a reasonable investigation, and reached reasonable conclusions. The circuit court therefore correctly applied the business judgment rule in deciding whether the SLC properly refused the appellants' demand that the corporations pursue the claims alleged in the derivative suit.[12] Under the rule, it was the appellants' burden to produce

---

12. The *Zapata* case was decided in 1981. Four years later, in *Rosengarten v. Buckley,* 613 F.Supp. 1493 (D.Md.1985), a district court ruled in a derivative suit that under Maryland law a board of directors who are interested may appoint a special litigation committee to evaluate a derivative suit brought against the corporation and that the recommendation of that committee can form the basis for the court's decision to dismiss or grant summary judgment in favor of the corporation. *Id.* The court predicted that, if faced with the question of what test should apply for a trial court in deciding whether to dismiss a derivative action when a special litigation committee has recommended not pursuing the derivative claims, Maryland courts would follow *Zapata.* As one commentator has observed, particularly given the 1999 amendment to CA section 2–405.1, which added subsection (e) setting forth the presumption that a director of a corporation has satisfied the standards of the business judgment rule, as set forth in subsection (a), the *Rosengarten* court's prediction "turned out to be wrong." Hanks, § 7.21[c], p. 276.20.

evidence that the SLC either (1) was not independent, (2) did not operate in good faith, or (3) did not conduct a reasonable investigation that reached reasonable conclusions. *See* Hanks, *supra*, § 7.21[c], p. 276.20 (stating, "[t]hus, in applying Maryland law in determining whether to uphold the decision of a board or board committee to terminate a derivative proceeding, a court may not review the merits of the derivative claim unless the presumption of [the business judgment rule] is rebutted").

The appellants' arguments pertaining to the duties owed by majority stockholders to minority stockholders are misplaced. The derivative suit is a means by which the shareholders can enforce the director's duties *owed to the corporation,* not the duties that the directors/majority shareholders owe to other shareholders. *See Shenker,* 411 Md. at 342, 983 A.2d 408 (stating, "the derivative form of action permits an individual shareholder or group of shareholders to bring suit to enforce a corporate cause of action against officers, directors, and third parties where those in control of the company refuse to assert a claim belonging to it") (quotations and citations omitted); *Paskowitz v. Wohlstadter,* 151 Md.App. 1, 9, 822 A.2d 1272 (2003). A derivative action is not the proper vehicle to seek redress for an alleged breach of a majority stockholder's fiduciary duties to a minority stockholder. *See Bender,* 172 Md.App. at 674, 917 A.2d 142 (stating, "[t]he claim regarding any harm to [shareholder's children] is personal to them, and not a cause of action that [the corporation] could pursue as a corporation; thus it was not a matter appropriate for a stockholder derivative action. The Demand Committee was not obligated to investigate any harm personal to appellants.").

Finally, there likewise is no merit in the argument that, because the corporations are small, closely held entities, the business judgment rule should not apply, and the circuit court should exercise its independent business judgment in deciding whether to dismiss the derivative action. CA section

2–405.1 equally applies to the corporations in this case as it does to larger entities.

## II.

The appellants next contend the circuit court erred in deferring to the SLC's decision not to pursue the derivative claims because the SLC's investigation and conclusions were not reasonable. Specifically, they argue that, because the derivative action complaint alleged what they characterize as self-dealing transactions by the Director Appellees, the SLC should have "critically examine[d] the stock transaction[s] under the entire fairness test[,]" instead of "simply appl[ying] their personal business judgment." Asserting that "[i]t is axiomatic that the 'investigation' of a corporate litigation committee cannot be deemed reasonable if the committee failed to apply a proper standard of review to the transactions it was charged to investigate," they argue that "[t]he failure of the [SLC] to apply the proper level of review required that the circuit court find that neither the [SLC's] investigation nor its conclusions were reasonable." [13]

To put this contention in perspective, we shall go into some detail about the conclusions the SLC reached about the stock sales and its investigation as related to those sales. As noted above, the SLC summarized the derivative claims of self-dealing as involving allegations of excessive compensation for the Director Appellees and other board members; acquisition of Maureen's stock and issuance of the stock to the Director Appellees and an employee (Sean, Jr.); and violation of preemptive shareholder rights.

---

**13.** According to the appellants, "the [SLC] admitted it did not even consider whether the terms of the transaction were fair to the corporations." In the Report, however, after finding that enhanced control in the hands of the managing directors was a "positive benefit for the corporations" and "the price received for those shares is more than in dollars ... [i]t rewards and expects services to be performed for the corporation," the SLC made a specific finding that "the price paid for the stock was appropriate."

With respect to compensation, the SLC reviewed the history of the corporations and their management and summarized for each of the Director Appellees his education, training, and experience as relevant to the business of the corporations. James holds bachelors and masters degrees in business, was the first non-engineer to complete the Trane sales and training program, worked in sales and then parts and then, in 1986, took over all of the corporations' operations. Louis, Jr. holds a bachelor's degree in business administration, attended the Trane sales and management dealer program, completed "numerous graduate sales and marketing courses," and within the corporations has worked as an outside salesman, account executive, manager of the existing sales group, vice president, and senior vice president. Cain is a CPA who began with the companies virtually at their inception, became chief financial officer in 1985, and is the manager to whom two-thirds of the companies' associates report.

As noted already, Sean is a lawyer. Sean, Jr. holds a bachelor's degree from Duke University. At the time of the SLC's investigation, Sean, Jr., had been employed full-time by the corporations for 5 years. (He had started working for the companies when he was 13.) During his full-time employment, he had worked performing filing, shipping oil samples, and in accounting and sales. He had attended the Trane graduate engineering program and was the second non-engineer to complete it. His present position was as an Account Executive, and he was in the process of obtaining his MBA.

The SLC studied the salaries paid to the directors (except Sean, who receives no compensation) for the years 2003 (when Louis, Sr., died) through 2007. For James (President and Chief Operating Officer), total salary and bonus was $450,000 in 2004, $615,000 in 2005, $635,000 in 2006, and not set for 2007 (although his regular salary for that year was $353,500). Louis, Jr.'s total compensation was $300,000 in 2004, $335,000 in 2005, $345,000 in 2006, and not set for 2007 (although his regular salary for that year was $327,700). Cain's total compensation was $300,000 in 2004, $410,000 in 2005, $425,000 in 2006, and not set for 2007 (although his regular salary was

$237,500). The SLC found that the top salesperson for the corporations in 2007 earned over $1.2 million dollars—substantially more than any of the Director Appellees; that the next highest income sales person earned slightly over $590,000; and that five more sales people earned between $400,000 and $500,000.

In concluding that the salaries of the Director Appellees were reasonable, the SLC stated:

> In sum, each individual's salary is commensurate with his education, experience, position, and tenure with the company. In addition, the salaries are commensurate with industry practices. The salaries are reasonable given the companies' growth, which is reflected in the net income. At least one sales person is earning more than the companies' President, and several employees' salaries are in the same range as the Officers and Directors. The compensation of the two top officers was set by the [Compensation Committee]. The former President's salary, with which no one ever took issue, exceeded the current President's. The Board exercised sound business judgment in approving this compensation, particularly since the companies paid $27,215,500 million in dividends to their shareholders between 2002 and 2007. Plaintiffs shared in the receipt of these dividends and performed no services for the corporations.

Report, at 16 (footnote omitted).

The shareholders in BTA as of the time of the SLC's investigation were the Louis J. Boland Trust B–1 (600 shares), Colleen (deceased), Eileen, John, Kevin, Michael, and Sean (200 shares each), James (766 shares), Louis, Jr., and Maureen (482 shares each), Sean, Jr. (70 shares), and Cain (282 shares). The shareholders in BTS at that time were Colleen (deceased), Eileen, John, Kevin, Michael, Sean, and Cain (300,300 shares each), James (902,400 shares), Louis, Jr. (751,250 shares), Sean, Jr. (75,075 shares), and Judith Guiliano (74,320 shares).[14]

---

**14.** Guiliano was a former employee. Over the years, Louis, Sr., had authorized the distribution of shares to other longtime employees of the

The SLC further traced the history leading up to the redemption of Maureen's stock in connection with her estate plan, noting that "the purpose of the acquisition was to fulfill the Instruction[s]" of Louis, Sr., that Maureen's needs be taken care of. The SLC concluded that the annuity plan established for Maureen

> was an excellent estate plan, prepared, approved, and recommended by Mrs. Boland's estate attorney. Its effect on the other shareholders was beneficial and fair. BTS was benefited by the return of its stock to the treasury and by the improvement of the status of its management as will be discussed hereafter....

The SLC further concluded that the price paid for Maureen's stock was fairly set by the Board of Directors, as it relied upon an independent appraisal. (The SLC noted as well that, if there were any inadequacy in the price paid for that stock, it would be her claim to make, not that of the shareholders.)

The SLC stated that "[t]he sales of treasury stock to Louis Boland, Jr., Lawrence Cain, James Boland, and Sean Boland, Jr., after the acquisition of Maureen Boland's stock is the complaint of self dealing in stock." It found as follows respecting the reasons behind the stock sales to the Director Appellees:

> The sales represented the Boards' providing an opportunity for some of the officers and directors to obtain more stock in the corporations. The goal was to provide management with a similar percentage of ownership as exists with others in the industry....
>
> * * *
>
> The Board determined that the stock sales were to further solidify successful management for the future well being of the corporation. It goes with out saying that it is common for corporations to give stock or stock options as

---

companies, including Peggy Byrnes, whose shares were redeemed in 1994, upon her death; Eleanor Baker, whose shares were redeemed in 2004, upon her death; and Judith Punghorst, whose shares were redeemed in 1994.

part of compensation. Here, it has the purposes of further binding management and encouraging performance to enhance personal dividend income. The difference with stock or stock options as part of the income package is that these shares were purchased. It is clear that Louis Boland, Sr. over many years had planned for the future management of the corporations and to facilitate that plan was offering stock to Louis Boland, Jr. and James Boland. This is demonstrated by [Louis's] Letter of Instruction directing that James and Louis, Jr. assume prominent leadership roles within the corporations upon his death, but also by his sale of stock to them prior to his death. In 1985 he sold each of them 100 shares in BTS. Again in 1986 he sold them each 100 additional BTS shares. In 1998, Mr. Boland, Sr. and his wife sold an additional 750 BTS shares to James and Louis, Jr. The 1998 transaction was based on an appraisal which was less than 125% of book value and with promissory notes. The SLC notes that by this 1998 transaction, Louis Boland, Sr. and Maureen Boland vested majority control of the voting stock of BTS in Louis, Jr. and James Boland. BTS is the major income producer and dividend source. In January and April of 2005, the sale of stock in BTS and BTA resulted in approximately the same majority percentage ownership in both corporations.... Report at 19–20 (footnotes omitted). With respect to Sean, Jr., the SLC found that the intent behind the stock sales was "to encourage his career goal to be with the corporation for its future stability and management."

In assessing the stock sales, the SLC applied a business purpose, *i.e.,* business judgment rule, test. It quoted from *Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App. 185, 198, 461 A.2d 45 (1983), that " 'an issue of ... stock that has the collateral effect of enhancing the power of incumbent management is not invalid if the transaction has as its principal purpose some proper corporate goal.' " Report at 21. The SLC concluded with respect to the stock sales that "[t]he enhancement of control is a positive benefit for the corporations" and the stock sales were "well within the business

judgment rule and done in good faith for the benefit of the corporation."

Finally, the SLC concluded that there was no merit to the appellants' claim that the stock sales had violated their preemptive rights as shareholders, *i.e.*, the rights of minority shareholders in a corporation not to have their ownership interests "diluted by the issuance of stock to others." Report at 23. From a comparison of the percentage stock ownerships before and after the stock sales, the SLC found that "[t]he change in ownership percentage is minimal at best and certainly has no material effect on the Plaintiffs' minority status." *Id.* (John and Kevin each had stock ownership in BTA of 5.6% at the end of 2004 and 5.2% at the end of 2005; and stock ownership in BTS of 8.2% at the end of 2004 and 7.7% at the end of 2005.) [15]

As we already have observed, the SLC's investigation took five months. There never has been a serious assertion by the appellants of lack of independence or good faith on the part of Cromwell or Wolfe or their counsel, Brault.[16] The SLC met with Michael, Eileen, John, Kevin, Cain, Louis, Jr., James, Heise, Sean, Jr., Sean, and counsel for Maureen. The interviews were at least 45 minutes and lasted up to 5 hours, with the longest interviews being with the appellants. The interviews were conducted separately and with the interviewees signing confidentiality agreements, to promote frankness. The SLC also gave counsel for the appellants and for the

---

15. The SLC noted, moreover, that Maryland had statutorily eliminated preemptive rights, unless provided for by a corporation's charter. The statute doing so was enacted after the formation of the corporations in this case, however. *See* CA § 2–205.

16. In their briefs in this Court, the appellants allude to a lack of independence on behalf of the SLC, but they do not point to any evidence in support. They suggest that the SLC members may not have been independent because the Director Appellees selected them. They do not offer any legal support for their suggestion, however, and the law does not support it. *See Rosengarten v. Buckley*, 613 F.Supp. at 1499 (stating, Maryland law "permits an interested board of directors to appoint a special litigation committee of independent directors to review a pending derivative suit").

corporations the opportunity to submit memoranda stating their differing positions. Counsel for the corporations submitted such a memorandum, while counsel for the appellants submitted the complaint in the derivative action. Pursuant to a request by Brault, the appellants' attorney met with the SLC to discuss the allegations in the derivative suit. The SLC reviewed and summarized a total of 131 documents in the course of its investigation.

We return to the appellants' contention that the SLC should have applied the "entire fairness test," instead of the business judgment rule, in assessing whether the stock sales were reasonable; and therefore the circuit court erred in deferring to the decision of the SLC under the business judgment rule. In *Bender*, we explained that the "entire fairness" rule is a "judicial review standard" that inquires into "fair process and fair price." *Bender*, 172 Md.App. at 670, 917 A.2d 142. When used, "if at all," it "is employed to evaluate transactions when directors are 'on both sides of a transaction.'" *Id.* at 670, 917 A.2d 142 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983)). Like the independent business judgment test of *Zapata*, the entire fairness test is a product of Delaware law. *See generally Weinberger*, 457 A.2d 701. Contrary to the argument advanced by the appellants, the issue in *Bender* was not whether the *demand committees* in that case erred by not applying an "entire fairness" test in investigating the transactions at issue. The issue was whether the *circuit court*, in assessing the demand committees' investigations and conclusions for reasonableness, erred by applying the business judgment rule to each transaction instead of applying an entire fairness test.

As the *Bender* Court explained, "Demand [c]ommittees, as disinterested persons, are required to conduct reasonable investigations of the claims asserted in a demand letter and, in making their decisions, exercise reasonable business judgment." 172 Md.App. at 671, 917 A.2d 142. Demand committees are not required to apply judicial standards of review, as they do not function as judicial panels. Rather, a

demand committee is charged with deciding whether pursuit of the derivative claim is in the corporation's best interests. *See Shenker,* 411 Md. at 344, 983 A.2d 408 (stating, "[o]nce demand is made, the corporation's board of directors must conduct an investigation into the allegations in the demand and determine whether pursuing the demanded litigation is *in the best interests of the corporation* ") (citations omitted; emphasis added).

We held in *Bender* that the circuit court, in reviewing the decisions of the two corporations' demand committees for purposes of deciding whether to dismiss the derivative action, was not required to apply the entire fairness test. We explained that the entire fairness test will apply to self-dealing transactions that affect the ownership status of a minority shareholder—such as a transaction eliminating or changing a minority shareholder's ownership interest, a self-dealing merger transaction, or a cash-out merger between parent and subsidiary that eliminated minority shareholders. The one example in Maryland case law that we cited—and indeed the only one that exists—was *Lerner v. Lerner Corp.,* 132 Md. App. 32, 750 A.2d 709 (2000). That case illustrates the type of situation in which the entire fairness test appropriately is applied on judicial review.

*Lerner* involved a reverse stock split in a closely held Maryland corporation in which the two shareholders were brothers who had been at odds, and in litigation, for years. In the early 1980's, the acrimony between the brothers became so intense that the majority shareholder tried to freeze out the minority shareholder. Litigation ensued, which was settled by an agreement in which the minority shareholder promised not be to involved in the activities of the business. Disputes over the implementation of the agreement spawned additional litigation. The assets of the business were being drained by the funds spent in litigation between the brothers. In 1998, the majority shareholder owned 89.9% of the stock in the company. At a special shareholders meeting, the corporation's charter was amended "to reclassify and convert each of the [c]orporation's common shares to 1/68th of a share, a 'reverse

stock split,' which would have the effect of reducing [the minority shareholder's] interest to less than one share" and, in lieu of issuing a fractional share, to convert the minority shareholder's interest to cash. 132 Md.App. at 38, 750 A.2d 709. The end result was to eliminate the minority shareholder's interest.

In a declaratory judgment action challenging the reverse stock split, the minority shareholder argued, among other things, that the transaction was illegal and amounted to a breach of the majority shareholder's fiduciary duty to him, as the minority shareholder. The minority shareholder asserted that the proper standard for judicial review of the transaction was the "entire fairness" test. The majority shareholder argued that the proper standard of review was "business purpose."

We held that the transaction was legal and that "the fairness rule is the appropriate test under these circumstances, *i.e.,* a reverse stock split in a closely held corporation with the effect of eliminating a minority stockholder, because it permits intervention on the facts of any given case when intervention is justified." 132 Md.App. at 57, 750 A.2d 709. Quoting extensively from Hanks, section 7.20, 264–66 (Supp. 1996), we adopted the view that, whether the transaction is in the form of a merger or a reverse stock split, because the majority is freezing out the minority, the concern is not whether the transaction has a business purpose but whether it is fair to the minority shareholders. We concluded that under the entire fairness test (or under a business purpose test) the reverse stock split was fair because there were good reasons, in the interest of the corporation, to pursue it "other than the desire, in and of itself, to oust a minority shareholder." *Id.* at 59, 750 A.2d 709.

Unlike *Lerner, Bender* did not involve direct claims for breach of fiduciary duties between majority and minority stockholders or a freeze-out transaction that eliminated the minority. It was a derivative action involving closely held corporations, in which plaintiff stockholders had alleged the

corporations had been harmed by certain actions of their directors, including the directors' approval of particular fees and loans as part of their own compensation, and in which demand committees had investigated the transactions in question and recommended against the corporations' pursuing the derivative claims. We held that the circuit court properly had applied the business judgment rule, and not the entire fairness rule, in deciding whether the demand committees reasonably had investigated the derivative claims and recommended against pursuing them.

In the case at bar, the appellants point out that the circuit court in *Bender* reviewed the recommendations of the demand committees respecting three transactions for entire fairness and argue, from that fact, that the transactions must have been self-dealing and that *Bender* therefore stands for the proposition that, whenever a demand committee is investigating a "self-dealing" transaction, the entire fairness test must be applied to assess its work. We disagree. One of the corporations in *Bender* was a Delaware corporation, and the entire fairness test would have been relevant to some of the transactions involving that corporation because the entire fairness test is a creature of Delaware law.

We conclude that the case at bar, like *Bender*, is one in which the standard of review for the circuit court, in assessing the reasonableness of the SLC's investigation and recommendations concerning the derivative claims, and in particular the claims that the stock sales were self-dealing transactions that in some way harmed the corporations, properly was the business judgment rule. These stock sales do not implicate the minority rights of shareholders the way freeze-out transactions of the kind dealt with in *Lerner* do. Moreover, as the SLC explained, the stock sales were a one-time benefit to the Director Appellees and to Sean, Jr. They were made available to the directors most intimately involved in the running of the corporations and to Sean, Jr., who was being groomed to play the lead role in the Boland family's effort to have their franchise extend to three generations. The continuation of the franchise was in the best interests of all the stockholders,

including the appellants and other stockholders who did not perform any services for the corporations, as they all received substantial dividend income.[17]

To the extent an Appellee Director had a personal interest in the outcome of the stock sale votes, each abstained. Moreover, enhancement of control, which the SLC found to be the primary purpose behind the stock sales, was particularly important given that the Trane Company recently had been sold to Ingersoll Rand and the franchise agreement on which the corporations depended remained terminable for no reason at all upon 30 days notice.

■ Under the business judgment rule, in assessing the reasonableness of a litigation committee's investigation and conclusions, the focus must be on the fact gathering methodology employed by the committee as opposed to its substantive decisions. *Bender*, 172 Md.App. at 671–72, 917 A.2d 142 (quoting *Levine v. Smith*, 591 A.2d 194, 213 (Del.1991)) (stating, "[r]easonableness implicates the business judgment rule's requirement of procedural due care; that is, whether [the directors, through the demand committee] acted on an informed basis in rejecting [the shareholder's] demand").

■ There are several non-exclusive factors courts look to in determining whether a demand committee conducted a reasonable investigation into a derivative claim:

(i) whether the committee engaged independent counsel to assist in the investigation; (ii) whether the committee produced a report, its length, and whether it documented the committee's procedures, reasoning, and conclusions; (iii) whether the committee properly identified the claims at issue; (iv) whether the committee reviewed the testimony of or interviewed directors, officers, and employees; (v) whether the committee (or counsel hired to assist it) reviewed

---

**17.** For closely held corporations, such as BTA and BTS, there is no market for the shares of stock, and therefore the value of the stock is in the dividends it produces.

documents regarding the questionable transaction; and (vi) the number of times the committee met.

*Scalisi,* 501 F.Supp.2d at 363 (citing *Bender,* 172 Md.App. at 672–73, 917 A.2d 142). These factors all were satisfied in the case at bar. As noted, the SLC hired independent counsel to aid in the investigation and report writing. It produced a 30-page report with 33 exhibits. Within the Report, it discussed the process used in its investigation and addressed each of the issues raised by the appellants in their demand letter and derivative complaint. The SLC interviewed all the relevant witnesses and reviewed hundreds of pages of documents including the Boards of Directors' meeting minutes, court pleadings, stock purchase agreements, personal and corporate correspondence, audited corporate financial statements, certified corporate appraisals, and stock redemption documents. The investigation lasted five months and, according to Cromwell's deposition testimony, he spent approximately 150 hours participating in the SLC's work.

The appellants assert that the SLC's investigation of the stock transactions was unreasonable because:

> The [SLC] did not ask what the purpose of the stock transaction was.... The [SLC] did not include the dividends to be received from the additional stock in determining the reasonableness of the Board Members' compensation.... The [SLC] could not articulate any objective standard that was utilized to conclude that the level of stock ownership by the Boards Members was "appropriate," or if 200 additional shares was reasonable, whether 400, or 600 more would also be reasonable.

The appellants also challenge the investigation of stock sale to Sean, Jr., stating that the SLC "did not state what, if any, binding 'commitment' [Sean, Jr.] made to the corporation[s] in consideration [for his stock purchase]." They state "[i]f one removes the fact that [Sean, Jr.] is the Chairman's son from the analysis, the lack of business justification is apparent."

We see no merit in these assertions. The Report discloses, contrary to what the appellants maintain, that from the inter-

views the SLC conducted and the documents it reviewed, it was able to determine that the stock sales "provide[d] management with a similar percentage of ownership as exists with others in the industry" and, by allowing the recipients to purchase the stock, to afford them a benefit with the goal "of further binding management and encouraging performance to enhance personal dividend income." As noted above, the SLC found that it was particularly important to bind management given that the Trane Company's recent purchase by Ingersoll Rand could bring the performance of the Boland franchise under scrutiny by new eyes in circumstances where the franchise could be terminated abruptly and for no reason.

As noted, the appellants complain that the SLC's analysis of the reasonableness of the Director Appellees' and Sean, Jr.'s compensation was deficient in that it did not include the dividends they will be paid from the stock that was sold to them. The SLC's Report addresses the issues of compensation and stock sales separately, at the same time acknowledging that stock options, and in this case actual stock sales, are a form of compensation. To the extent that the stock sales are a type of compensation, we note that " 'a board's decision on executive compensation is entitled to great deference. It is the essence of business judgment for a board to determine if "a particular individual warrant[s] large amounts of money." ' " *Bender,* 172 Md.App. at 681–82, 917 A.2d 142 (quoting *Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000) (in turn quoting *Grimes v. Donald,* 673 A.2d 1207, 1215 (Del. 1996))).

In any event, whether the SLC included the dividends that the Director Appellees and Sean, Jr., will receive in their compensation when assessing it is not of consequence. The appellants have not challenged any of the compensation assessments made by the SLC; below, they only challenged Cain's compensation, and they have not pursued that challenge on appeal. And it always has been clear that, just as the appellants receive dividends from their stock holdings, the Director Appellees and Sean, Jr., will receive dividends from their stock holdings. Indeed, the value of the stock, especially

the stock in BTS, is in large part a function of the dividends it produces, not only for the individual appellees but also for the appellants and all the stockholders. The fact that the stock produces dividends does not undermine the reasonableness of the SLC's conclusion that the stock sales were a benefit conferred for the purpose of binding management at a time when, given the changes in the Trane Company, strong management of the Boland franchise was critical.

In regard to the appellants' complaint that the SLC did not articulate an objective standard to apply in assessing the appropriate level of stock ownership for the Director Appellees, we disagree that that was necessary. The SLC compared the level of stock ownership to that of similarly situated companies, and in part on that basis, concluded that the stock sales to the Director Appellees served a reasonable corporate goal. It was not necessary for the SLC to craft a formula. It had to determine only whether "any rational business person" could have reached the same decision as the Director Appellees. *Bender*, 172 Md.App. at 667, 917 A.2d 142.

Finally, the appellants also complain that they did not learn, until Louis, Jr., made an offhand reference in June 2005, of the April 4, 2005 decision by the boards approving the stock sales, and that this "hiding" of important information from them was not taken into account by the SLC in its investigation. The minutes of a shareholders' meeting of BTA, held on April 18, 2005, reveal, however, that Sean, Jr., was present and that "[c]opies of a listing of all shareholders and their interests" were "made available for the shareholders' review." The appellants were present at that shareholders' meeting.

The SLC acted properly in assessing the transactions at issue for business purpose, *i.e.*, in evaluating whether, in bringing the transactions about, the Director Appellees were acting for the benefit of the corporations, and not merely to benefit themselves. The circuit court then properly reviewed the SLC's work under the business judgment rule. We agree with the circuit court that the appellants failed to rebut the presumption that the SLC's investigation into the derivative

claims was reasonable and that its conclusions were within the realm of sound business judgment.

## III.

Finally, as to the stock sale transactions, the appellants contend the circuit court erred by not holding an evidentiary hearing in which they could introduce evidence; by not disposing of this case under Rule 2–502, instead of Rule 2–501; and by granting summary judgment *sua sponte* and when there were "substantial disputes of material fact." *See* Rule 2–501(f) (stating, "[t]he court shall enter judgment in favor of or against the moving party if the motion [for summary judgment] and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law"). The appellants also complain that the court erred in granting summary judgment on their claim of "oppression," which pertained to the SPAs.

As mentioned above, after the SLC released its Report, the Corporate Appellees filed a motion to dismiss pursuant to Rule 2–502. Under that rule, entitled "Separation of questions for decision by the court," a court may rule on a question that is within its sole province to decide in the manner it deems expedient, including by accepting stipulated facts and finding facts after receiving evidence. The motion and the appellants' opposition to it were accompanied by numerous exhibits. The Director Appellees filed a motion to dismiss or in the alternative for summary judgment.

At the outset of the hearing on pending motions on June 12, 2008, counsel for the appellants stated that it was his position that he was entitled to an evidentiary hearing. The judge replied that he wanted to hear argument of counsel first. Counsel for the appellants said he thought he would be able to convince the court to deny the motion to dismiss by argument, but that the court could not "go the other way without an evidentiary hearing." The arguments then proceeded.

 In the course of his argument, counsel for the Corporate Appellees sought to move into evidence the binders of documents that were given to the SLC for its review; the Report; and the depositions of Cromwell and Wolfe. These items all were accepted into evidence without objection. The arguments continued to conclusion without counsel for the appellants offering any evidence, asking to offer evidence, or proffering what evidence would be offered if the court would so allow. The court did not rule at the conclusion of the hearing. Thus, the outcome of the hearing was not known to the appellants at the hearing's conclusion, but no steps were taken by their counsel to put evidence before the court. In that circumstance, the appellants cannot now complain that the court erred by refusing to hold a hearing in which they could introduce evidence. There is nothing in this record to support the notion that they would not have been permitted to offer evidence if they had taken steps to do so. Accordingly, this argument has been waived.

 The court properly ruled on summary judgment in any event. Although the appellants assert, in their primary brief, that there were disputes of material fact that precluded the entry of summary judgment, they have not given even one example of such a fact. Rather, they cite to their "opposition to the corporations' motion for summary judgment and the exhibits and affidavit submitted therewith[,]" apparently to adopt the disputed facts identified within that filing. The disputed facts contained in that document are not material, however, because none of the facts have anything to do with the independence and good faith of the SLC members and whether their investigation and conclusions were reasonable. Furthermore, at the June 12, 2008 hearing the appellants did not argue that there were material facts in dispute.[18]

---

18. As we have explained, in a wrongful refusal action in which the business judgment rule prevails, the facts material to the court's decision are whether the litigation committee was independent and acted in good faith, conducted a reasonable investigation, and reached reasonable conclusions. *See* Hanks, § 6.8, p. 193–94 (stating, "The principal benefit of the presumption established by the business judgment rule is

As this Court explained in *Bender,* a Rule 2–502 hearing functionally is a bench trial. 172 Md.App. at 663–64, 917 A.2d 142. When asked to dismiss claims by deciding an issue within its purview to decide, the court not only rules on the law but sits as a trier of fact. Obviously, if there are no material facts in dispute, the court will rule on the undisputed material facts, which is the same as ruling on a motion for summary judgment. That is what happened here. Moreover, the court pointed out that the Corporate Appellees' motion was one to dismiss, and, on a typical motion to dismiss under Rule 2–322(c), when materials are submitted outside the four corners of the complaint, the motion is to be treated as one for summary judgment. That too is what happened here. For both of these reasons, the court properly disposed of the derivative matter by way of summary judgment.

 Nor do we find merit in the appellants' argument that "[t]he corporations never moved for summary judgment on the derivative complaint [and therefore] [i]t was error for the circuit court to grant summary judgment, effectively *sua sponte* and without the appellants ever having been advised and given an opportunity to respond and defend against the consideration." To be sure, the Corporate Appellees did not move for summary judgment and, generally, courts are prohibited from granting summary judgment *sua sponte.* In

---

to enable the defendant to prevail on a motion for summary judgment without presenting any evidence in a case where the plaintiff presents no evidence on the issue of the defendant director's conduct"); *see also Auerbach,* 419 N.Y.S.2d 920, 393 N.E.2d at 1003 (stating, "In addition to the issue of the disinterested independence of the special litigation committee, addressed above, the disposition of the present appeal turns, then, on whether on [the directors'] motions for summary judgment predicated on the investigation and determination of the special litigation committee, [the derivative plaintiff] by tender of evidentiary proof in admissible form has shown facts sufficient to require a trial of any material issue of fact as to the adequacy or appropriateness of the *modus operandi* of that committee or has demonstrated acceptable excuse for failure to make such tender."). Thus, it was appropriate for the circuit court to grant summary judgment unless the appellants had evidence to show a disputed fact as to the SLC members' independence, good faith or reasonableness. There is nothing in this record to suggest that there was any such evidence.

*Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 147, 642 A.2d 219 (1994), the Court of Appeals explained that courts may grant summary judgment in favor of a non-moving party if the opposing party sought summary judgment, but not if neither party sought summary judgment.

Here, however, the Director Appellees in fact filed a motion to dismiss, or in the alternative, for summary judgment on the derivative claims. Given the nominal defendant status of the Corporate Appellees, summary judgment in favor of the Director Appellees and against the appellants effectively would be summary judgment in favor of the Corporate Appellees. Granting summary judgment in favor of the Corporate Appellees did not run afoul of Md. Rule 2–501. *See McNees v. City of Mountain Home,* 993 F.2d 1359, 1361 (8th Cir.1993) (stating, "[i]n those instances where the party against whom judgment was entered is provided sufficient notice and opportunity to contest summary judgment and where the liability of the party who did not file a motion is merely derivative, such that no genuine issues of material fact exist, a *sua sponte* grant of summary judgment is permissible").

The record does not support the appellants' assertion that they were not "given an opportunity to respond and defend against the consideration." On the contrary, they had several opportunities to do so, including in responding to the Director Appellees' motion to dismiss or in the alternative for summary judgment; and they took advantage of these opportunities, as evidenced by their opposition papers and the oral argument their counsel presented at the June 12, 2008 hearing. Thus, both because the Director Appellees moved for summary judgment and because the Corporate Appellees' motion to dismiss properly was treated as a motion for summary judgment, the court did not *sua sponte* grant summary judgment in favor of the appellees.

The appellants' last argument is that "the court's dismissal of the appellants' oppression claim was in error" because the

court "improperly resolved a disputed fact." [19] In support, they cite the following from the circuit court's September 5, 2008 Memorandum Opinion:

If the [Director Appellees] did in fact threaten to use the SPAs against [the appellants] in an effort to manipulate them, then that would constitute oppression and that action would not receive the benefit of the business judgment rule. However, there is insufficient evidence to support such allegations. [Footnote omitted, but discussed below.] *On that basis, the decision not to pursue litigation on the ground of shareholder oppression was within the sound province of the business judgment rule.*

(Emphasis added.)

The appellants argue that by stating that "there is insufficient evidence to support such allegations" the circuit court improperly resolved a disputed fact, and granted summary judgment on that basis. Read in context, however, the circuit court's finding was that the SLC's decision not to pursue an oppression claim was reasonable because, as the SLC explained in the Report, there was insufficient evidence to support the allegation.[20] The appellants overlook the footnote in the quoted passage, which states, "The SLC has stated in its Report that although there were discussions about enforcing the SPAs in order to regain control of management of the real estate LLCs, no action was ever taken." Thus, the appellants' argument was, and is, without factual basis. The circuit court did not improperly resolve a disputed material fact. Rather, it determined that the SLC's investigation and recommendation regarding the oppression claim were reason-

---

**19.** Moreover, although we need not decide the issue, we note that in alleging oppression and seeking dissolution, the appellants were asserting a direct shareholder claim and requesting a shareholder remedy, which is not permitted in a derivative action.

**20.** In particular, there was no evidence that the boards had taken any action to enforce the SPAs with respect to the appellants, and therefore there could not be oppression as to them. The only action to enforce any SPA was as to Colleen's estate, and that was the subject of the declaratory judgment action.

able and deferred to its judgment that the claim not be pursued. The court acted properly in that regard.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**